679 A.2d 174

UNITED MOBILE HOMES, INC., A NEW JERSEY CORPORATION, CEDARCREST, INC., A NEW JERSEY CORPORATION AND CEDARCREST MOBILE HOME VILLAGE ASSOCIATES, NEW JERSEY LIMITED PARTNERSHIP D/B/A CEDARCREST MOBILE HOME PARK, PLAINTIFFS–APPELLANTS, v. FOREMOST INSURANCE COMPANY, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 15, 1996—Decided July 22, 1996.

Stern, J., concurred and filed statement.

Before Judges SHEBELL, STERN and NEWMAN.

*Suzanne Q. Chamberlin* argued the cause for appellant (*Hannoch Weisman,* attorneys; *Kevin J. Bruno,* of counsel; *Ms. Chamberlin,* on the brief).

*Richard D. Picini* argued the cause for respondent (*Picillo Caruso,* attorneys; *Mr. Picini,* on the brief).

The opinion of the court was delivered by

SHEBELL, P.J.A.D.

Plaintiffs United Mobile Homes, Inc. ("United"), Cedarcrest, Inc. ("Cedarcrest"), and Cedarcrest Mobile Home Village Associates ("Cedarcrest Village") (collectively "plaintiffs"), filed this action against defendant Foremost Insurance Company ("Foremost" or "defendant") on March 4, 1992, seeking a declaration of coverage under numerous policies for environmental cleanup costs. On October 29, 1993, the Law Division judge heard cross-motions for summary judgment, and concluded that both the "owned property" and "pollution" exclusions applied to bar coverage. Plaintiffs appeal.

In 1977, Cedarcrest Mobile Home Park was constructed near Vineland, consisting of 284 mobile homes on individual lots. The mobile homes were to a large extent heated by oil from individual underground tanks holding 250 to 275 gallons each. In 1979 Cedarcrest Village acquired ownership of the park, from which United Mobile purchased it in 1986. United Mobile owned the lots, the oil companies evidently owned the underground tanks, and the tenants owned the trailers and the oil in the tanks.

In June 1990 United Mobile discovered possible oil contamination from an inactive tank it removed, and notified DEP. Following its investigation, DEP served United Mobile with a notice of violation for discharging hazardous substances, and instructed it to remediate the contamination, submit a plan, and remove two other underground tanks in the park. In July 1990, United Mobile began removing all of the remaining 133 underground oil tanks at the park, converting to natural gas because of concern for the penalties applicable to oil leaks or discharges.

United Mobile hired Aguilar Associates & Consultants, Inc. ("Aguilar") to supervise the conversion and conduct environmental assessments as the project progressed. Aguilar's tank removal and testing revealed that only two of the 133 tanks had holes. At forty-six sites, however, Aguilar noted odors or "staining" of the subsoil. Of these forty-six excavations, approximately thirty tested showed contamination at levels below 300 ppm, the upper

allowable contamination limit for the project according to Aguilar. Fourteen sites with contamination above that level were re-excavated and back-filled until all but two had contamination levels of less than 300 ppm. Based on the softness of the soil at these two sites, Aguilar was unsure whether additional excavation would be possible.

United Mobile submitted Aguilar's report to DEP. DEP initially disagreed with Aguilar's 300 ppm-standard and wanted United Mobile to comply with the DEP's usual 100 ppm-stricture. Following a meeting with United Mobile, Aguilar and DEP in March 1991, Aguilar submitted a plan for installing groundwater monitoring wells after soil removal was completed. On April 5, 1991, DEP approved, subject to several amendments, United Mobile's plan to test groundwater. Four monitoring wells were subsequently installed, one of which indicated contamination. Xylene was detected at 376 ppb, Benzene at 14 ppb, and Toulene and Ethylbenzene were detected at "[l]ow parts per billion." In the opinion of Aguilar's geologist, that contamination was caused by the on-site oil spills. An additional groundwater sample was collected from the one well at an undetermined date.

In July 1993, Anderson, Mulholland & Associates, Inc. ("Anderson") reviewed the information regarding contamination at the park. In Anderson's opinion, it was unlikely that off-site groundwater had been impacted from the storage tank releases. According to DEP, the final groundwater sample "did not indicate a problem at the site," and it eventually closed its investigation of the matter.

United Mobile claims to have spent over $229,000 in completing the tank removal, cleanup and monitoring at the park. As to possible causes of contaminated areas where leaking tanks were not found, plaintiffs' investigation revealed several tenants who remembered particular incidents of oil being spilled on the ground over the years by different fuel oil delivery services the tenants used. Although the tenants had difficulty remembering particular dates of spills, the record indicates that they generally believed

such spills to have taken place in the mid or latter 1980s. In addition, one tenant recalled that around 1981 he replaced his tank because of a "pin hole" in it.

Between December 1985 and December 1990, defendant issued United Mobile a series of commercial policies, evidently including comprehensive general liability (CGL) coverage. Each policy promised to pay "all sums which the *insured* shall become legally obligated to pay as damages because of ... *property damage* to which this insurance policy applies, caused by an *occurrence*...." An "occurrence" was an "accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured."

Each policy contained an "owned property" exclusion, excluding coverage

(K) to *property damage* to

(1) property owned or occupied by or rented to the *insured,*

(2) property used by the *insured,* or

(3) property in the care, custody or control of the *insured* or as to which the *insured* is for any purpose exercising physical control;

but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to *property damage* (other than to *elevators* ) arising out of the use of an elevator at premises owned by, rented to or controlled by the *named insured;*

"[P]roperty damage" included "1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom; or 2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."

The 1985–1986 policy contained exclusion (f), which barred coverage

to *bodily injury* or *property damage* arising out of the discharge, dispersal, release, or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this

exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental; . . . .

Although the subsequent policies also included exclusion (f), they also included a so-called "pollution exclusion" endorsement effectively supplanting the earlier exclusion (f):

It is agreed that the exclusion relating to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants is replaced by the following:

(1) to *bodily injury* or *property damage* arising out of the actual, alleged or threatened discharge, dispersal, release or escape of pollutants:

   (a) at or from premises owned, rented or occupied by the *named insured;*

   (b) at or from any site or location used by or for the *named insured* or others for the handling, storage, disposal, processing or treatment of waste;

   (c) which are at any time transported, handled, stored, treated, disposed of or processed as waste by or for the named insured or any person or organization for whom the *named insured* may be legally responsible; or

   (d) at or from any site or location which the *named insured* or any contractors or subcontractors working directly or indirectly on behalf of the *named insured* are performing operations:

     (i) if the pollutants are brought on or to the site or location in connection with such operations; or

     (ii) if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize the pollutants.

(2) to any loss, cost or expense arising out of any governmental direction or request that the *named insured* test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

In June, 1990 United Mobile advised defendant of the discharge, and in November 1991, defendant advised that it was denying coverage based upon the exclusions. With respect to exclusion (f) in the 85–86 policy, defendant concluded that any spills were not "sudden and accidental"; in addition, defendant believed that the "owned property" exclusions applied to bar coverage.

The Law Division judge concluded that the owned property exclusion barred coverage here. However, we have since held in *Morrone v. Harleysville Mutual Ins. Co.,* 283 *N.J.Super.* 411, 419–20, 662 *A.*2d 562 (1995), and have reaffirmed in several decisions

handed down today, that the "owned property" exclusion in CGL policies does not preclude coverage for defense and indemnification related to groundwater contamination. *See Reliance Ins. Co. v. Armstrong World Indus.,* 292 *N.J.Super.* 365, 678 *A.*2d 1152 (App.Div.1996). In *Reliance,* we have further held that groundwater contamination is not excluded by the "use" and "care, custody or control" exclusion such as may be found in the policies here in issue.

The judge referred extensively to the Supreme Court's opinions in *Morton Int'l, Inc. v. General Acc. Ins. Co. of Am.,* 134 *N.J.* 1, 629 *A.*2d 831 (1993), *cert. denied,* —— *U.S.* ——, 114 *S.Ct.* 2764, 129 *L.Ed.*2d 878 (1994), and *State, Dep't of Envtl. Protec. v. Signo Trading Int'l, Inc.,* 130 *N.J.* 51, 612 *A.*2d 932 (1992). While he acknowledged a "marginal" issue of whether the groundwater beneath the site was affected by any spills, he concluded that the evidence was insignificant enough so that it did not "engender[ ] a genuine issue of material fact."

■ Putting the exclusions aside, the initial issue is whether plaintiffs have suffered "damages" under the policy. The original DEP notice of violation confined remediation to only two underground tanks, but plaintiffs decided to remove all of the underground tanks as a precaution. In April 1991, DEP directed plaintiffs to drill four test wells after noticing evidence of petroleum contamination in four test samples. As plaintiffs themselves decided to remove all of the underground tanks as a precaution, there is no basis to consider the total costs of the conversion. It is neither "environmental response" or "remediation" expenses so as to qualify as "damages" under the subject policies. *See Morton, supra,* 134 *N.J.* at 27, 629 *A.*2d 831.

According to Aguilar's summary, only forty-six tank sites "required cleaning and sample collection," only fourteen of those required additional remediation, and only two sites—neither of which was one of the violations originally cited by DEP—retained elevated contamination levels after remediation. It appears that under applicable environmental laws plaintiffs were compelled to

report and to remediate whatever discharges they encountered once they began removing tanks. Thus, barring an exclusion, the only expenses that might qualify as "damages" in this case are those expenses related to removal of the two tanks originally cited in the violation, and to remediation of soil in those few cases where contamination was discovered around particular tanks. However, under the "owned property" exclusion, even environmental response expenses would not appear to be covered if they constituted no more than damages to the insured's own soil. *See Signo supra,* 130 *N.J.* at 63–64, 612 *A.*2d 932.

With respect to the groundwater beneath the property, the evidence suggested that there was little pollution to begin with, and that any such contamination has already been remediated. Nevertheless, above any applicable deductibles, the fact that plaintiffs' "damages" have been less than catastrophic does not preclude coverage of expenses that are "damages" under the policy. Unfortunately, the present record does not adequately reflect what expenses plaintiffs incurred specifically related to groundwater pollution. Thus, further proofs are required before a determination can be made as to what amounts incurred were "damages" under the policies. We direct a remand on this issue.

Similarly with regard to the pollution exclusions, plaintiffs say that the pre–1986 policy's "pollution exclusion" language was inapplicable because the record establishes that no matter how the oil was spilled into the soil, such spillings were necessarily "sudden and accidental" and therefore not excluded by exclusion (f), and the judge addressed only the post–1986 policies in his decision. Our Supreme Court has previously ruled that the "sudden and accidental" language in the typical exclusion (f) provision bars coverage only where the insured "intentionally discharged, dispersed, released, or caused the escape of a known pollutant." *Morton Int'l v. General Acc. Ins. of Am., supra,* 134 *N.J.* at 28–31, 629 *A.*2d 831. In addition, the Court made it clear that the proper analysis of the intent question requires a case-by-case review of applicable circumstances such as "the duration of the discharges,

whether the discharges occurred intentionally, negligently or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct, and the existence of subjective knowledge concerning the possibility or likelihood of harm." *Id.* at 86–87, 629 *A.*2d 831. On the record before us, we cannot reasonably determine when the spills, leaks, or discharges took place, when plaintiffs first learned of such spills and what they did upon learning of them, and what sums were expended for those spills as opposed to replacing all underground tanks generally.

The language of the post–1986 pollution endorsements was not before the *Morton* Court. According to the Court, the various policies at issue there involved coverage for years 1960 to 1978 (134 *N.J.* at 10–14, 629 *A.*2d 831), whereas the endorsement here was submitted for approval in 1985. Regarding subsection (2) of the later pollution endorsements, which precludes coverage for the costs of monitoring and cleaning up spills at the government's direction, the exclusionary language of subsection (2) seems clear on its face. *See Harvard Indus., Inc. v. Aetna Cas. & Sur. Co.,* 273 *N.J.Super.* 467, 481, 642 *A.*2d 438 (Law Div.1993). However, we do not view it as an exclusion that operates to limit damages for a covered occurrence. It would only appear to apply if the underlying event causing the remediation is excluded. A contrary reading would, to a large extent, negate the insurer's liability for a covered contamination as to those expenses compelled by governmental interdiction. The issue may, however, be re-visited on remand if it appears to be applicable to any of the contamination in question.

Reversed and remanded.

Judge Stern concurs for the reasons expressed in his concurring opinion in *Reliance v. Armstrong,* 292 *N.J.Super.* 365, 678 *A.*2d 1152 (App.Div.1996).