292 N.J. Super. 365 (1996)
678 A.2d 1152
RELIANCE INSURANCE COMPANY, PLAINTIFF-RESPONDENT-CROSS-APPELLANT,
v.
ARMSTRONG WORLD INDUSTRIES, INC., DEFENDANT-APPELLANT-CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 1996.
Decided July 22, 1996.
*368 Before SHEBELL, STERN and NEWMAN, JJ.
Christopher Sipes (pro hac vice) of Covington & Burling, and Donald Kiel of Pitney, Hardin, Kipp & Szuch argued the cause for defendant-appellant/cross-respondent (Mark S. Herr of Cohen, Shapiro, Polisher, Shiekman and Cohen, and Robert N. Sayler, Marc S. Mayerson and Mr. Sipes of Covington & Burling, on the brief).
Charles W. Gabage and Steven Engelmyer argued the cause for plaintiff-respondent/cross-appellant (Eisenstat, Gabage & Berman, attorneys; Mr. Gabage, on the brief; Hangley, Connolly, Epstein, Chicco, Foxman & Ewing, attorneys; Steven R. Fischer, Regina A. Vogel, and Deborah Weinstein, on the brief).
Karen L. Jordan, Deputy Attorney General, argued the cause amicus curiae for State of New Jersey, Department of Environmental Protection (Deborah T. Poritz, Attorney General of New Jersey, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Jordan, on the brief).
Laura A. Foggan (pro hac vice) of Wiley, Rein & Fielding argued the cause amicus curiae for Insurance Environmental Litigation Association (Smith, Stratton, Wise, Heher & Brennan, attorneys; Wendy L. Mager, on the brief; Wiley, Rein & Fielding, attorneys; Ms. Foggan, John E. Barry and Steven D. Silverman, of counsel).
Nielsen V. Lewis argued the cause amicus curiae for The New Jersey State League of Municipalities (Goldshore, Wolf & Lewis, attorneys; Mr. Lewis, on the brief; Stickel, Koenig & Sullivan, attorneys; Fred G. Stickel, III, of counsel and on the brief; Skey, Dumont & Matejek, attorneys for amicus curiae The New Jersey State League of Municipalities).
Cooper, Rose & English, and Kirkpatrick & Lockhart, attorneys (pro hac vice) for amici curiae WMX Technologies, Inc., and ASARCO Incorporated; Anderson, Kill, Olick & Oshinsky, attorneys for amici curiae Allied Signal, Inc., BOC Incorporated and *369 Metex, Inc.; and Hannoch Weisman, attorneys for amici curiae London International U.S. Holdings, Inc., Princeton-Gamma-Tech, Inc. and Prospect Industries, Inc. (Jerry Fitzgerald English, Matthew L. Jacobs and Bruce H. Nielsen (pro hac vice), Elizabeth A. Sherwin, and Suzanne Q. Chamberlin, and Jordan S. Stanzler (pro hac vice), on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
This appeal involves the issue of comprehensive general liability ("CGL") policies of insurance providing coverage for costs of remediation of environmental pollution to groundwater beneath an insured's site, and whether the "owned property" exclusions of the policies bar coverage. We hold that the costs of remediation of groundwater pollution is covered and may not be denied under the "owned property" exclusion of the CGL policy.
Defendant, Armstrong World Industries, Inc. (Armstrong), was a prior owner of a manufacturing site determined to have been contaminated  possibly through defendant's activities  and subject to various environmental cleanup requirements. In addition to the soil on the site, its groundwater was also contaminated.
For a period of time defendant was insured through CGL policies issued by plaintiff, Reliance Insurance Company (Reliance), that incorporated exclusions for damage to property "owned, occupied by or used by" or "premises alienated by" the insured. Long after, when defendant notified plaintiff it was being sued by a site transferee for indemnification for the costs of environmental cleanup, plaintiff denied coverage and initiated this action for a declaration of policy coverage. The Law Division concluded that because there was no evidence that any groundwater pollution had harmed a third-party, the "owned property" and "alienated property" exclusions would bar coverage. The court also concluded that because defendant suffered no prejudice from plaintiff's delay in denying coverage, plaintiff was not estopped from asserting the exclusions as a bar to coverage. Plaintiff's *370 cross-appeal relates to the court's ruling that any spills that occurred were "accidents" under the policies.
Plaintiff instituted this action on November 16, 1990, seeking a declaration that pending claims for property damage against Armstrong, in a lawsuit Armstrong ultimately settled, involving claims for environmental contamination created by its former manufacturing plant were not covered under policies plaintiff's predecessor had issued. Defendant counterclaimed, alleging breach of contract and requesting a declaration of coverage. On July 17, 1992, defendant was granted partial summary judgment, the court ruled that the policy language "caused by accident" did not contain a temporal limitation. Although the court denied without prejudice the cross-motions regarding the policy exclusions, it ruled that remediation expenses incurred to prevent the immediate threat of off-site contamination were not excluded from coverage. Reliance Ins. Co. v. Armstrong World Indus., Inc., 259 N.J. Super. 538, 564-68, 614 A.2d 642 (Law Div. 1992), opinion modified, 265 N.J. Super. 148, 625 A.2d 601 (Law Div. 1993).
Following the Supreme Court's decision in State, Dep't of Envtl. Protec. v. Signo Trading Int'l., Inc., 130 N.J. 51, 612 A.2d 932 (1992) involving "owned property" exclusions as they related to environmental contamination of a party's site, Reliance moved for reconsideration. In its decision reported as Reliance Ins. Co. v. Armstrong World Indus., supra, 265 N.J. Super. at 162-64, 625 A.2d 601, the court concluded that the policy exclusions barred coverage. These cross appeals followed. We have calendared back-to-back these appeals and seven others which we decide today. Adron, Inc. v. Home Ins. Co., 292 N.J. Super. 463, 679 A.2d 160 (App.Div. 1996); Kentopp v. Franklin Mut. Ins. Co., 293 N.J. Super. 66, 679 A.2d 701 (App.Div. 1996); Ohaus v. Continental Cas. Ins. Co., 292 N.J. Super. 501, 679 A.2d 179 (App.Div. 1996); Sagendorf v. Selective Ins. Co., 293 N.J. Super. 81, 679 A.2d 709 (App.Div. 1996); Smidth v. Travelers Ins. Co., 292 N.J. Super. 483, 679 A.2d 170 (App.Div. 1996); Strnad v. North River Ins. Co., 292 N.J. Super. 476, 679 A.2d 166 (App.Div. 1996); United Mobile *371 Homes, Inc. v. Foremost Ins. Co., 292 N.J. Super. 492, 679 A.2d 174 (App.Div. 1996). We have permitted the Department of Environmental Protection (DEP), the New Jersey State League of Municipalities (League of Municipalities), Insurance Environmental Litigation Association (Insurance Environmental), and various private insured corporations (insureds) to participate in the appeals as amicus curiae. The full exposition of the issues through the arguments provided by all participating has been invaluable to this court.
Defendant's property, a glass manufacturing plant in Millville, had been in use since the 1800s, and was acquired by defendant in 1938. 259 N.J. Super. at 542, 614 A.2d 642. Over the years, before and after defendant acquired it, areas of the site were used as dumping grounds for waste from the manufacturing process, including hazardous and petroleum substances. In 1969, defendant sold the property to the Kerr Glass Manufacturing Corporation (Kerr) under a contract that required defendant to indemnify Kerr from damages related to defendant's prior operations. Id. at 542-43, 614 A.2d 642. In 1983 Kerr sold a portion of the site to American National Can Company (ANCC). Id. at 543, 614 A.2d 642. In 1985, ANCC transferred the property to Triangle Acquisition Corporation (Triangle). Ibid.
In anticipation of the transfer to Triangle, ANCC instituted an environmental investigation pursuant to the terms of the Environmental Cleanup Responsibility Act (ECRA), N.J.S.A. 13:1K-6 to -13.[1]Ibid. In June 1985, ANCC entered into an administrative consent order with DEP. ANCC alleged that two portions of the site indicated soil and groundwater pollution. A fourteen-acre area in the northeast corner of the site had been used for "widespread" dumping at least until the late 1960s, and sampling of the area's soil and the sediment in a tributary contiguous to the area indicated the presence of such contaminants as total petroleum *372 hydrocarbons (TPHCs), arsenic, lead and mercury. Further, these contaminants were in the groundwater beneath that area. It was not known whether soil contaminants present in other areas of landfill had entered the groundwater.
Environ Corporation's (Environ) 1987 ECRA Sampling Plan set forth specific findings of pollutants in two particular areas. The report noted that:
The ground water sample [from one of the two shallow monitoring wells] was also analyzed for [contaminants]. Only arsenic was present at concentrations above ISEE guidelines.
....
The ground water sample from [the other shallow monitoring well] was analyzed [for contaminants]. PAHs and PPMs were not detected.... Petroleum hydrocarbons were present, but at concentrations below the ISEE recommended cleanup guidelines.
....
The ground water sample from [the one deep monitoring well] was analyzed for [contaminants]. Most of the TPHCs and PP + 40 compounds were not detected, and of those that were, all were present at concentrations below the ISEE recommended cleanup guidelines.
....
A relatively small and low-level arsenic plume is present in the western corner of AEC 1. At this time, it is premature to develop any remedial system for this arsenic contamination. ENVIRON proposes to develop an appropriate remedial system, if necessary, or establish alternate concentration levels as cleanup levels after evaluating the effects of this plume on off-site environments (e.g., the Maurice River).... Previous river sediment sampling indicated that contamination currently exists from upstream of the facility. It is likely that arsenic levels in the Maurice River could be high, given the various industrial activities that have occurred at upgradient locations in the past.
Arsenic, in general, has an extremely high distribution coefficient that contributes to a highly attenuated migration of arsenic in ground water. This means that the arsenic plume cannot be readily removed from the aquifer because the desorption or dissolution rate of arsenic constituents from the aquifer material to ground water is extremely slow .. . [and], migration of the arsenic plume will be *373 extremely slow. Therefore a ground water remedial plan is not proposed at this time.
The report noted as to a second area that:
[I]t is premature to develop a remedial system for the arsenic contamination in the area of the former drainage ditch. An appropriate remedial approach, if needed, or alternate concentration levels will be developed after further investigation of the interaction of ground water and surface water and evaluation of the effects of this arsenic plume on the Maurice River. Currently, the arsenic concentration in the downgradient well ... is well below the action level for arsenic.
As part of its overall conclusions as to groundwater contamination, the report said:
Ground water sampling results identify two areas (AECs 5 and 8) where VOCs have been detected at elevated levels and two areas (AECs 1 and 46) where arsenic has been detected above the drinking water standard of 50 ppb. Although concentrations of these constituents have been detected above the informal ECRA action levels and/or state MCLs, alternate concentration levels will likely be used to make a final determination of the need for ground water cleanup. To establish alternate concentration levels, it will first be necessary to understand the interaction of ground water and the Maurice River.
In January 1989, DEP conditionally approved ANCC's sampling plan, one of the conditions of which was further groundwater sampling. In January 1990, DEP notified ANCC that its cleanup plan was unapproved because "the ground water investigation has not been completed and all sources of contamination have not been delineated." On March 1, 1990, ANCC set forth additional remediation plans.
Environ continued testing and periodically reporting on ongoing soil sampling. In its June 1992 progress report, Environ reported that as of May 1992 various monitoring wells in AEC 1 and AEC 46 still tested positive for arsenic.
Following ANCC's environmental investigation, in 1989 it filed a Federal action against Kerr seeking contribution, under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C.A. § 9607(a), for the costs of pollution remediation. 259 N.J. Super. at 543, 614 A.2d 642. Kerr then filed a third-party complaint against Armstrong. Ibid. Armstrong received process on April 3, 1989, and on April 13, 1989, it wrote plaintiff informing it of the lawsuit and stating it believed plaintiff *374 and its other carriers were obligated to defend it. Defendant enclosed copies of the third-party complaint, informed plaintiff of the attorney it had initially contacted for defense, and requested plaintiff contact its legal department with any objections. It also advised plaintiff to "coordinate ... the defense of this lawsuit" with Armstrong's attorney. On June 28, 1989, plaintiff responded that it had received the third-party complaint and that it would "notify [defendant] within a reasonable time of [its] decision in this matter." Plaintiff reserved its rights under the policies.
By February 1990, defendant had, over the course of the federal litigation, incurred almost $650,000 in defense fees. Between April 1989 and November 1990, defendant's Associate General Counsel of Legal Affairs and its General Manager of Insurance allegedly spoke to plaintiff's claims representatives many times, without plaintiff seeking to disclaim liability under the policies. Defendant's Insurance Department's General Manager had a similar experience. Defendant contends that on November 20, 1990, after plaintiff filed the complaint in this matter, it first learned plaintiff was disclaiming coverage. On March 12, 1991, defendant settled the federal lawsuit having spent more than $1 million defending the action. The terms of the settlement were confidential and the agreement was filed under seal. 259 N.J. Super. at 544 n. 2, 614 A.2d 642.
Between 1942 and 1952 Reliance's predecessor, Standard Accident Insurance Company, issued annual CGL policies to defendant. 259 N.J. Super. at 544, 614 A.2d 642. Each policy described coverage in part as follows:
Coverage C  Property Damage Liability ... [The insurer agrees t]o pay on behalf of the insured all sums which the insured shall become obligated to pay as damages because of injury to or destruction of property, including loss of use thereof, caused by accident.[2]
[259 N.J. Super. at 548, 614 A.2d 642.]
*375 The scope of coverage was limited by specific exclusions, in particular the "owned-property" and contractual-liability exclusions:
This policy does not apply ... to injury to or destruction of (1) property owned, occupied by or used by or rented to the insured, or (2) except with respect to the liability under sidetrack agreements and the use of elevators or escalators, property in the care, custody or control of the insured; or (3) any goods or products manufactured, sold, handled or distributed or [premises alienated] by the name insured or work completed by or for the name insured, out of which the accident arises.
This policy does not apply ... to liability assumed by the insured under any contract or agreement except a contract as defined herein.
[Ibid.]
Within the "Conditions" section of the policy, the term "contract" was defined as follows: "A warranty of goods or products or, if in writing, a lease of premises, easement agreement, agreement required by municipal ordinance, sidetrack agreement, or elevator or escalator maintenance agreement." Ibid. The terms "property," "accident," and the phrase "all sums which the insured shall become obligated to pay as damages" were not defined. Ibid.
Defendant argues that plaintiff lost the right to rely upon any coverage exclusions because it failed to make a timely coverage determination and to communicate that decision to defendant in a reasonable manner. In determining whether an insurer should be estopped from asserting exclusion defenses under policies because of prejudice to the insured, the test is whether the insurer's acts or omissions "constitute[d] a material encroachment upon the rights of an insured to protect itself by handling the claim directly and independently of the insurer." Griggs v. Bertram, 88 N.J. 347, 359, 443 A.2d 163 (1982).
Prejudice justifying an estoppel against the insurer will be presumed where

*376 there has been a long lapse of time without any indication by the insurance carrier of a loss or rejection of coverage, during which the insured justifiably expects to be protected by the carrier and cannot, except at the risk of forfeiting coverage, act for itself under the policy [because] .. . there is a realistic restraint upon the insured's contractual freedom of action and a significant incursion upon its legitimate, protectable interests.
[Id. at 362, 443 A.2d 163.]
The court here concluded that plaintiff took no action to prejudice defendant. 265 N.J. Super. at 156, 625 A.2d 601. We agree. Plaintiff did not investigate the site or "assume the defense" of the insured. Defendant engaged counsel on its own behalf before it received plaintiff's June 28, 1989, acknowledgement letter. Id. at 155-56, 625 A.2d 601. There is no indication that plaintiff caused defendant to suffer any inability to direct its own defense and investigate the matter. Plaintiff's June 28, 1989, letter to defendant said: "We are presently reviewing our obligation to [you]. We will notify you within a reasonable time of our decision in this matter." 265 N.J. Super. at 155, 625 A.2d 601. This letter did not imply that plaintiff believed it had a duty to defendant or that plaintiff was acting for or would defend defendant.
Therefore, despite the significant time interval, plaintiff's failure to more timely notify defendant of its decision as to the applicability of the policy exclusions may only act as an estoppel if in fact defendant can show actual prejudice. See Miller v. Board of Trustees of Teachers' Pension & Annuity Fund, 179 N.J. Super. 473, 477, 432 A.2d 560 (App.Div.) (prejudice an element of estoppel), certif. denied, 88 N.J. 502, 443 A.2d 714 (1981). Inasmuch as defendant had itself secured the services of private counsel and ultimately reached a settlement, we see no evidence that plaintiff's actions prejudiced defendant in the settled litigation.
Defendant, however, asserts that the Federal action did not raise the possible bar of the policy exclusions, and as a result it "did not try even to develop" any facts in that action about off-site migration of pollution, the absence of which proof ultimately ended in the decision in this case that coverage was precluded under the *377 "owned property" exclusion. Defendant asserts it was thereby prejudiced. Any lack of proof regarding those aspects of the case in our view cannot properly be attributed to an insurer's failure to defend. If such proofs were necessary for defendant to prevail on the coverage issue, it was defendant's obligation to discover the facts establishing its claim of coverage. In any event, our ruling in this appeal regarding groundwater pollution coverage renders that aspect of the alleged prejudice moot.
The Law Division judge noted that although DEP had made allegations against defendant's transferee claiming groundwater pollution, "there is no evidence presented that groundwater pollution has affected any actual third party adjacent property claimant." 265 N.J. Super. at 160, 625 A.2d 601. Thus, based on State v. Signo, supra, 130 N.J. at 64, 612 A.2d 932, holding that CGL policies do not provide coverage for the mere threat of third-party damage where there has been no injury, the judge concluded that the mere possibility of off-site migration of pollution would not be sufficient to invoke coverage. 265 N.J. Super. at 160-61, 625 A.2d 601.
The burden is on the insured to bring the claim within the basic terms of the policy. Diamond Shamrock Chems. v. Aetna Cas. & Sur. Co., 258 N.J. Super. 167, 216, 609 A.2d 440 (App.Div. 1992), certif. denied, 134 N.J. 481, 634 A.2d 528 (1993). The carrier, however, bears the burden of establishing that any matter falls within the exclusionary provisions of the policy. Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 26, 483 A.2d 402 (1984).
Although plaintiff contests the cause and extent of groundwater pollution at the site, it acknowledges that "there is some evidence here that the groundwater at the ... [site] has been contaminated." Thus, the question is whether the groundwater beneath defendant's site is property of the insured.
In 1992, our Supreme Court held that the typical CGL policy did not cover the costs of preventing future environmental damage *378 to a third party unless those costs result from "prevent[ing] imminent or immediate future damage when a present injury has already been demonstrated." State v. Signo, supra, 130 N.J. at 64, 612 A.2d 932. A year later the Court in Morton Int'l v. General Acc. Ins. Co. of Am., 134 N.J. 1, 27, 629 A.2d 831 (1993), cert. denied, ___ U.S. ___ 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994), decided that "environmental-response costs and remediation expenses" were "damages" under the terms of the CGL policies before it. The Court referred approvingly to Justice O'Hern's dissent in Signo, supra, where he sought to apply a "common man's" approach to the insurance policy definition of "damages." Ibid.
Between 1987 and 1992, United States District Court Judge Brotman twice applied New Jersey law in the area of insurance coverage for groundwater pollution. Gloucester Tp. v. Maryland Cas. Co., 668 F. Supp. 394 (D.N.J. 1987); Chemical Leaman Tank Lines, Inc. v. Aetna Cas. and Sur. Co., 788 F. Supp. 846 (D.N.J. 1992). In the earlier of the two cases, Gloucester Tp., supra, he was deciding insurance coverage issues involving the expenses of cleanup that the Township was incurring in connection with a court-ordered closure of its landfill. 668 F. Supp. at 395-96. The judge recognized in that case, which involved present and continuing damage to "groundwater both on and offsite," that "the reality of toxic dump clean-up and the clean-up at issue in the case at bar requires repairs and preventive measures to environmental systems such as groundwater which do not follow property boundaries, but rather `flow' both on the property of the insured and third party neighbors." Id. at 399. Citing an unpublished decision of this court in which we "found that the underlying claim of DEP did state a colorable claim under parens patriae for damages to the natural resources of the state," he said that a legal cause of action exists to protect these resources. Id. at 398. He thus concluded that the costs of cleanup and closure constituted "damages" under the subject CGL policies. Id. at 399-400.
*379 Later, in Chemical Leaman, supra, Judge Brotman was again interpreting insurance policy exclusions in a pollution matter, where the plaintiff, presented with cleanup costs under Federal law for remediating contamination of ground and surface water "in the vicinity" of its plant, sought insurance coverage under its CGL policies. 788 F. Supp. at 848-51. The judge again concluded that the insured's "cleanup costs which it is obligated to pay pursuant to [the Federal law] with respect to ground and surface water contamination in the vicinity of," but not at its plant, constituted compensable "property damage" under the relevant provisions of the CGL policies. Id. at 852.
We have heretofore expressly addressed the "owned property" exclusion as it relates to an insured's pollution of groundwater beneath the insured's site. Morrone v. Harleysville Mut. Ins. Co., 283 N.J. Super. 411, 419-20, 662 A.2d 562 (App.Div. 1995). In Morrone, the insurer appealed a grant of summary judgment directing it to provide the insured a defense under several occurrence-based "garage" policies. 283 N.J. Super. at 413-14, 662 A.2d 562. The insured had sold the property, and thereafter purchasers sued her alleging gasoline leaks that caused both soil and groundwater contamination. Id. at 414, 662 A.2d 562. One of the insurer's defenses was that the exclusion barring coverage did not extend to "property damage to property owned ... by the insured...." Id. at 416-17, 662 A.2d 562.
In Morrone, we considered the conflicting trial court decisions in Reliance, supra, and UMC Stamford, Inc. v. Allianz Underwriters Ins. Co., 276 N.J. Super. 52, 647 A.2d 182 (Law Div. 1994). Id. at 418-19, 662 A.2d 562. After addressing the reasoning of each, we said:
These cases raise potentially far-ranging concepts of ownership of groundwater beneath a person's land. They are each well-reasoned; one is not clearly more cogent than the other.
[Id. at 419, 662 A.2d 562.]
We recognized groundwater's "unique" qualities, and ultimately concluded that "groundwater does not clearly fall within the *380 category of `owned property' for the purposes of the exclusion." Id. at 419-20, 662 A.2d 562. Because exclusionary clauses must be narrowly read and ambiguities are to be resolved in favor of the insured, Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992), we held that the insurer was obligated to defend groundwater damage claims, despite the policy's owned property exclusion. See also, Pittston Co. v. Allianz Ins. Co., 905 F. Supp. 1279 (D.N.J., 1995).
We see no need to revisit the issue or to rehash the various policy arguments for and against holdings finding coverage and exclusion. They have, as we noted, been well argued before us. For varying reasons, the majority of jurisdictions to have considered the ownership-of-groundwater issue have concluded that groundwater below real property does not "belong" to the property owner. See Carol Crocca, Annotation, Liability Insurance Coverage For Violations of Antipollution Laws, 87 A.L.R. 4th 444, 536-39 (1991). Some courts have expressly concluded, largely based on environmental statutes not unlike New Jersey's, that groundwater is a public resource belonging to the government and is thus "third party" property for purposes of "owned property" exclusions in insurance policies. See Intel Corp. v. Hartford Acc. & Indem. Co., 952 F.2d 1551, 1565 (9th Cir.1991) (under a California statute all water within the state was state property, and therefore "[d]amage to groundwater is not damage to property `owned or occupied or rented to' the [insured]" under the policy); AIU Ins. Co. v. FMC Corp., 51 Cal.3d 807, 274 Cal. Rptr. 820, 828 n. 6, 799 P.2d 1253, 1261 n. 6 (1990) (under the California water code all water belonged to the people of the state, but water use may be acquired by appropriation); State v. New York Cent. Mut. Fire Ins. Co., 147 A.D.2d 77, 542 N.Y.S.2d 402, 403 (1989) (court held that under New York law groundwater is a natural resource protected by the State as trustee for the public, and therefore oil that had either entered the groundwater or threatened to do so caused "damage to the property of a third party"); Aronson Assoc. Inc. v. Pennsylvania Nat. Mut. Cas. Ins. Co., 14 Pa. D & C 3rd 1, 9 (Dauphin Co. 1977) (under Pennsylvania's Clean Streams *381 Act, "streams and pools" beneath the insured's lands constituted "state waters," so that the owned property exclusion did not apply to exclude insurance coverage for cleanup costs, aff'd), mem., 272 Pa.Super. 606, 422 A.2d 689 (1979)); Riehl v. Travelers Ins. Co., Civil Action 83-0085, 1984 WL 178942 (W.D.Pa. August 7, 1984), slip op. at 4 (citing Aronson, supra, the court found that the "surface and sub-surface waters" on the insured's land were "not property owned by the insured," and that consequently coverage existed for "damages to the waters of The Commonwealth of Pennsylvania"), rev'd on other grounds, 772 F.2d 19, 22-24 (3rd Cir.1985) (court reverses grant of summary judgment but does not indicate whether lower court erred in finding that where the insured had polluted groundwater, the "owned property" exclusion was inapplicable); Upjohn Co. v. New Hampshire Ins. Co., 178 Mich. App. 706, 444 N.W.2d 813, 819 (1989) (Michigan court concluded that the "owned property" exclusion did not apply to remediation costs at the insured's Puerto Rico property, stating in part that "we believe that contamination of the groundwater was compensable under both policies because groundwater belonged to the people of Puerto Rico rather than to" the insured, citing a Puerto Rican statute), modified on other grounds, 461 N.W.2d 486 (Mich. 1990), rev'd, 438 Mich. 197, 476 N.W.2d 392 (1991); and Maryland Cas. Co. v. Wausau Chem. Corp., 809 F. Supp. 680, 693 (W.D.Wis. 1992) (under Wisconsin law groundwater beneath a person's land is not owned by him or her "but is akin to an easement not subject to the owned-property exclusion").
Some courts have gone even farther, clearly expressing that the State's interest in groundwater is a property right. Spangler Const. v. Industrial Crankshaft, 326 N.C. 133, 388 S.E.2d 557, 563 (1990) (where the court noted that "injury to the State's natural resources is `property damage'" under CGL policies because the state's interest in protecting its natural resources is a property right); Minnesota Mining & Mfg. Co. v. Travelers Indem. Co., 457 N.W.2d 175, 182 (Minn. 1990) ("[p]ollution of the groundwater is damage to public property" because the state on behalf of its citizens has a proprietary interest in state natural resources); *382 City of Edgerton v. General Cas. Co., 172 Wis.2d 518, 493 N.W.2d 768, 783-84 (App. 1992) (the court found that the "owned property" exclusion is inapplicable "where the concern is not primarily the premises of the insured, but rather the substantial harm to third-party property, including natural resources [such as groundwater] belonging to the people of the state"), aff'd in part, rev'd in part, 184 Wis.2d 750, 517 N.W.2d 463 (on appeal, court did not reach the "owned property" exclusion issue), cert. denied, ___ U.S. ___, 115 S.Ct. 1360, 131 L.Ed.2d 217 (1995); and Patz v. St. Paul Fire & Marine, 15 F.3d 699, 705 (7th Cir.1994) (the court did not reach the issue of whether groundwater under the insured's property is owned by it, but nonetheless commented that "the cases appear to hold" that groundwater is "owned" by the State).
However, numerous other courts have concluded that groundwater in its natural state cannot be deemed "property" that is "owned" by anyone. See United States Aviex Co. v. Travelers Ins. Co., 125 Mich. App. 579, 336 N.W.2d 838, 843 (1983) (court held that based on application of the "reasonable use" doctrine as applied in Michigan, the owner of land atop groundwater does not "own" the groundwater subjacent); LaSalle Nat'l Trust v. Schaffner, 818 F. Supp. 1161, 1169-70 (N.D.Ill. 1993) (court reasoned that because groundwater in Illinois is subject to the "reasonable use" doctrine it "is not a matter of legal title," and therefore could not be "owned" by the insured); Figgie Int'l, Inc. v. Bailey, 25 F.3d 1267, 1271 (5th Cir.1994) (based on the insured's failure, in connection with a coverage action, to establish actual contamination of groundwater under its property, the court expressly refused to resolve whether Louisiana "owns water above and below real property," but cited an earlier state decision where that particular court treated groundwater as a "fugitive mineral"  something owned by no one until captured) (citing Adams v. Grigsby, 152 So.2d 619, 622-24 (La. Ct. App.), certif. denied, 244 La. 662, 153 So.2d 880 (1963)); Claussen v. Aetna Cas. & Sur. Co., 754 F. Supp. 1576, 1580 (S.D.Ga. 1990) (under Florida law, the ownership of land does not carry with it any ownership of vested rights to underlying groundwater not actually diverted and applied to a beneficial *383 use, so that a CGL "owned property" exclusion would not bar coverage); cf. Gerrish Corp. v. Universal Underwriters, 947 F.2d 1023 (2d Cir.1991) (the court noted that the "presence of... pollution in ... groundwater" was "proof of damages to property not owned, controlled, or possessed" by the insured, so that the "owned property exclusion" was inapplicable), cert. denied, 504 U.S. 973, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992); United States v. Conservation Chem. Co., 653 F. Supp. 152, 200 (W.D.Mo. 1986) (the district court adopted a special master's conclusions that groundwater was not "owned or controlled" by the insured, so that a policy exclusion on those grounds could not defeat coverage).
Nevertheless, at least one court has expressly concluded that, as within its jurisdiction, groundwater is not "owned" by the State. Bausch & Lomb, Inc. v. Utica Mut. Ins. Co., 330 Md. 758, 625 A.2d 1021, 1035-36 (1993). In Bausch & Lomb, the Maryland Supreme Court considered whether the State possessed the requisite property interest in groundwater contaminated by environmental pollution to qualify the groundwater as "third-party property" for purposes of the insured's CGL policy. Id., 625 A.2d at 1024-25. After noting that "the State is said to be the owner of the navigable waters within its boundaries," the court explained that such "ownership" was not absolute but as a "quasi trustee for the public benefit and to support the rights of navigation and fishery to which the entire public are entitled therein." Id., 625 A.2d at 1033. With respect to "subterranean waters," the court stated that it had previously "suggested a preference for" the "American Rule," which held that "the landowner is limited to a reasonable exercise of the owner's proprietary right in the water, i.e., such an exercise as may be reasonably necessary for some useful or beneficial purpose, before obstructing, diverting or removing percolating water to the injury of a neighbor." Id., 625 A.2d at 1034. But the court concluded that "common-law principles of groundwater were created to adjudicate disputes between neighboring property owners who claimed a right to use" the groundwater, and were thus of limited help in deciding the question of state ownership of groundwater. Ibid.
*384 Turning its attention to particular enactments, the court noted that "[n]either the Maryland Constitution nor any statute proclaims the State to be the owner of waters within its borders." Ibid. Nevertheless, it noted the "many provisions" in state statutes where the legislature had included groundwater within the definition of "waters of the State" and "waters of this State," but distinguished such statutes as pertaining to "the State's regulatory maintenance of clean water." Ibid. After noting that nothing in its review of any legislative history indicated that "the legislature ascribed ownership of groundwater to the State," it concluded that the "legislative pronouncements" of record merely demonstrated that the state "has committed itself to regulatory oversight of the groundwaters of Maryland to benefit ... citizens." Ibid. And although in the case before it "the question of groundwater ownership [arose] in the context of a potentially insurable injury by pollution," Maryland's "interest in groundwater [nonetheless] rests on its power to preserve and regulate." Id., 625 A.2d at 1036. Thus, it found the State's power was not a "property interest within the contemplation of the insurance policy in dispute." Ibid.
Finally, several courts that have generally concluded that groundwater is "property of the state" have also recognized that, under particular circumstances, it might still be considered the insured's "property" for purposes of the "owned property" exclusions. See Shell Oil Co. v. Winterthur Swiss Ins. Co., 12 Cal. App.4th 715, 15 Cal. Rptr 2d 815, 844 (1993) (court concluded that although private ownership rights in groundwater might be "limited" by California law that stated that all water in the state was the property of the people, there was a question of fact as to whether the groundwater at issue fell within the "care, custody or control" language of the policy's "owned property" exclusion), reh'g denied and opinion modified on other grounds (February 22, 1993), review denied (May 13, 1993); cf. Lane v. Federated Rural Electric, 114 Or. App. 156, 834 P.2d 502, 505 (groundwater and the right to control such groundwater belong to the public, and while the insured had a right to appropriate the groundwater *385 under its realty, there was no evidence that it had made any attempt to do so, so that such groundwater was not within the exclusion for property "owned, used or otherwise controlled" by the insured), review denied, 314 Or. 727, 843 P.2d 454 (1992).
Our United States Supreme Court has expressly recognized "the legal fiction of state ownership" with respect to groundwater resources, noting "the demise of the public ownership theory" as to natural resources, and stating that it was merely "legal shorthand" for the State's legitimate interest in preserving and regulating important resources. Sporhase v. Nebraska, 458 U.S. 941, 951, 102 S.Ct. 3456, 3465, 73 L.Ed.2d 1254, 1263 (1982); see also Toomer v. Witsell, 334 U.S. 385, 402, 68 S.Ct. 1156, 1164, 92 L Ed. 1460, 1466 (1948). (State-ownership is merely expressive "of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource").
In Morrone, supra, we applied the principle of construing exclusions against the insurer where terms are deemed ambiguous. 283 N.J. Super. at 420, 662 A.2d 562. We recognize that "in the absence of a specific definition in an insurance policy, the words must be interpreted in accordance with their ordinary, plain and usual meaning." Daus v. Marble, 270 N.J. Super. 241, 251, 636 A.2d 1091 (App.Div. 1994). The exclusion, however, is for damages to the property of the insured. Although the insured has a property right in the reasonable use of the groundwater, payment is not being sought for damage to or loss of the right to use groundwater. We remain firm in our conclusion that the exclusion should not apply where the damage is to the groundwater itself instead of to the insured's "property" right of reasonable use.
Our courts adhere to the "reasonable intention of the parties" test where "the phrasing of the policy is so confusing that the average policyholder cannot make out boundaries of coverage." Signo Trading, supra, 130 N.J. at 62-63, 612 A.2d 932 (quoting Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 246-47, 405 A.2d 788 (1979)). In this case, the absence of the definition of "property" could easily confuse the average policyholder as to the extent of *386 coverage when attempting to apply the exclusion to the costs related to discovery, monitoring and remediation of polluted groundwater.
We must also consider whether the groundwater falls under the "care, custody or control" of the insured exclusion. In New Jersey, the "care, custody or control" exclusion of a CGL policy is not applicable where the damage is "merely incidental" to the property upon which the work is being done by the insured. Condenser Serv. v. American Mut. Liab. Ins. Co., 58 N.J. Super. 179, 183-84, 155 A.2d 789 (App.Div. 1959), certif. denied, 31 N.J. 548, 158 A.2d 450 (1960). Moreover, our courts generally view the "care, custody or control" issue as fact sensitive. See e.g., Elcar Mobile Homes, Inc. v. D.K. Baxter, Inc., 66 N.J. Super. 478, 491, 169 A.2d 509 (App.Div. 1961) ("We are of the opinion that what constitutes `care, custody, or control' [under the terms of a policy exclusion] ... depends not only upon whether the property is realty or personalty, but as well upon many other facts, such as the location, size, shape and other characteristics of the property, what the insured is doing to it and how, and the interest in and the relation of the insured and others to it.") Thus, in Morrone, supra, 283 N.J. Super. at 420, 662 A.2d 562, we noted that groundwater, "other than being a source of potable water ... is certainly not susceptible to the custody or control of a property owner." We adhere to this ruling.
We turn to the "alienated premises" exclusion which we have held "is designed to extend the [owned property] exclusion to claims by subsequent owners of property previously owned by the insured." Wickner v. American Reliance Ins. Co., 273 N.J. Super. 560, 567-68, 642 A.2d 1046 (App.Div. 1994), aff'd, 141 N.J. 392, 661 A.2d 1256 (1995). We are satisfied that this exclusion is inapplicable to claims of this nature relating to groundwater. Inasmuch as the owned property exclusion is inapplicable, it cannot be extended by the alienated property exclusion whose purpose is limited to preventing the circumvention of the owned property exclusion. *387 Further, since the insured did not own the groundwater, it was not part of the premises alienated by the insured.
The policies are contingent in part upon damages being "caused by accident." Plaintiff contends that the judge erred in construing those provisions to apply to continuous discharges of pollutants over many years, while effectively ignoring what plaintiff says was an intended temporal limitation upon any event deemed an "accident."
In Morton, supra, the Court had to determine the extent of coverage under CGL policies for the owners of a mercury-processing plant who sought reimbursement for costs incurred in defending a DEP action and remediating pollution at the site. 134 N.J. at 6-7, 629 A.2d 831. Justice Stein reviewed the development of CGL policies from accident-based to occurrence-based, stating that the term "accident" in the pre-1966 policies was "generally construed ... to encompass ongoing events that inflicted injury over an extended period provided that the injury was unexpected or unintended from the insured's standpoint." 134 N.J. at 31, 629 A.2d 831 (citations omitted). And see our opinion in the same case, concluding that the "pre-1966 policy ... left the definition of `accidents' to the courts which more broadly construed the term." 266 N.J. Super. 300, 336, 629 A.2d 895 (App.Div. 1991). Morton involved both pre- and post-1966 policies, and the Supreme Court noted that, with respect to the accident based policy at issue, "the Appellate Division correctly acknowledged that the trial court had focused improperly on the manner in which the injury had been caused and had erroneously concluded that the policy did not provide coverage for the unexpected result of a deliberate act." 134 N.J. at 81, 629 A.2d 831.
Plaintiff asserts that the judge erred in construing "accident" without regard to any temporal element. We disagree. Our Supreme Court noted that the pre-1966 policies were construed generally to encompass ongoing injuries or harmful events over an extended period so long as the injury was neither expected nor intended. Morton, supra, 134 N.J. at 31, 629 A.2d 831; Diamond *388 Shamrock, supra, 258 N.J. Super. at 199-200, 609 A.2d 440; and Broadwell Realty Srvs. v. Fidelity & Cas. Co. of N.Y., 218 N.J. Super. 516, 532, 528 A.2d 76 (App.Div. 1987), overruled in part on other grounds, Morton, supra, 134 N.J. at 28, 629 A.2d 831. The Court went on to hold
that in environmental-coverage litigation a case-by-case analysis is required in order to determine whether, in the context of all the available evidence, "exceptional circumstances [exist] that objectively establish the insured's intent to injure" [citation omitted]. Those circumstances include the duration of the discharges, whether the discharges occurred intentionally, negligently or innocently, the quality of the insured's knowledge concerning the harmful propensities of the pollutants, whether regulatory authorities attempted to discourage or prevent the insured's conduct and the existence of subjective knowledge concerning the possibility or likelihood of harm.
[134 N.J. at 86-87, 629 A.2d 831.]
The Court also addressed the standard for pollution-exclusion policies. Id. at 87, 629 A.2d 831. It did not, however, differentiate between the accident-based and occurrence-based policies for purposes of whether the single pre-1966 policy applied to the ongoing pollution at the site, thereby implying that damages sought under an accident-based policy are not automatically excluded simply because they occurred over time.
We reject plaintiff's assertion that the record indicates defendant in fact understood that the term "accident" had a temporal meaning, inasmuch as the applicable standard is one of the insured's objectively reasonable expectations rather than its subjective understanding. Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 617, 503 A.2d 862 (1986). There does not appear to be any question of fact presented as to whether defendant either expected or intended the damages at issue here, as that inquiry was framed by the Morton Court. 134 N.J. at 86-87, 629 A.2d 831. Nonetheless, we do not preclude development of the issue on remand.
Finally, plaintiff contends that the California Court of Appeals has already addressed this issue between these two parties and concluded that "an accident policy covers only unexpected and *389 unintended events which are also sudden" (citing Armstrong World Industries, Inc. v. Aetna Casualty & Sur. Co., 26 Cal. Rptr.2d 35, 91 (Cal. App. 1993), review granted sub nom. and opinion superceded, In re Asbestos Ins. Coverage Cases, 27 Cal. Rptr.2d 488, 866 P.2d 1311 (Cal. 1994) review transferred to Cal. App., 46 Cal. Rptr.2d 174, 904 P.2d 370 (Cal. 1995), decision after transfer, 45 Cal. App.4th 1, 52 Cal. Rptr.2d 690 (1996)). Plaintiff has not briefed the subsequent developments in that case, and the opinion to which it cites was subsequently superseded. 27 Cal. Rptr.2d 488, 866 P.2d 1311. In any event, California law would not be applicable here. "[T]he construction of a contract will ordinarily be governed by the law of the state in which the contract was made, and this general rule is applicable to policies of insurance." Keystone Ins. Co. v. Bowman, 138 N.J. Super. 544, 549, 351 A.2d 767 (App.Div. 1976).
Reversed and remanded.
STERN, J.A.D. (concurring).
State v. Signo Trading Intern., Inc., 130 N.J. 51, 612 A.2d 932 (1992), is controlling on us, even though only two of the four-member majority (and two of the dissenters) are now on the Court. Nevertheless, despite its statement with respect to the "owned property exclusion," that "courts should resort to the doctrine of reasonable expectations only when `the phrasing of the policy is so confusing that the average policy holder cannot make out the boundaries of coverage,'" 130 N.J. at 62, 612 A.2d 932 (citation omitted), in that case there was no injury to any property other than the insured's. Signo involved no evidence of either contaminated groundwater, see 130 N.J. at 65, 612 A.2d 932, or injury to a third party. Furthermore, there was no endeavor "to prevent imminent or immediate future damages when a present injury has already been demonstrated." Id. at 64, 612 A.2d 932. According to the Court, therefore, "the policy does not cover the costs of clean-up performed by or on behalf of an insured on its own property when those costs are incurred to alleviate damage to *390 the insured's own property and not to the property of a third party." Id. at 63, 612 A.2d 932. The Court held "that the effect of the owned property exclusion is to make the policies' coverage inapplicable in the absence of property damage to third parties...." Id. at 66-67, 612 A.2d 932.
In Morrone v. Harleysville Mutual Ins. Co., 283 N.J. Super. 411, 662 A.2d 562 (App.Div. 1995), a panel of this court concluded that "ground water does not clearly fall within the category of `owned property' for purposes of the exclusion" because of the general rules concerning construction of insurance policies and exclusions. The court also held that groundwater is "not susceptible to the custody or control of the property owner." Id. at 420, 662 A.2d 562. Thus, the panel concluded that a carrier had a duty to defend a former property owner in a groundwater contamination case. But Morrone involved a declaratory judgment action after complaints were filed "against plaintiff by subsequent purchasers." Id. at 414, 662 A.2d 562.
I am satisfied that the holding of Morrone is dispositive of the principal issue of whether groundwater is "owned property" for purposes of the policy exclusion and that because groundwater is not "owned property," its contamination must give rise to "damages" to some third party. In light thereof Signo is not dispositive, and it is irrelevant whether the insured is sued by a subsequent purchaser, an adjoining property owner or the State, or is required to take remedial action by the Department of Environmental Protection. I would not revisit the issues resolved in Morrone. Cf. Hellwig v. J.F. Rast & Co., 215 N.J. Super. 247, 254, 521 A.2d 896 (App.Div. 1987) (Stern, J.A.D. concurring).
I add only that the question of whether a carrier has an obligation to defend or indemnify under an insurance policy poses a very different issue than whether the insured can be held responsible for losses to a third party or the costs of remediation. That groundwater is not "owned property" in terms of the carrier's obligation to its insured does not, of course, impact on the *391 common law and statutory obligations of the insured for groundwater contamination under its property.
I join the opinions of the court in this and the related cases.
NOTES
[1] In 1993 ECRA was amended and is now known as the Industrial Site Recovery Act (ISRA), L. 1993, c. 139.
[2] The 1951 calendar year policy evidently included an endorsement changing the "caused by accident" language to an "occurrence" basis, though the trial judge stated that all of the subject policies were "pure `accident' based". 259 N.J. Super. at 550, 614 A.2d 642.