292 N.J. Super. 483 (1996)
679 A.2d 170
F.L. SMIDTH & CO., PLAINTIFF-APPELLANT,
v.
THE TRAVELERS INSURANCE COMPANY, THE TRAVELERS INDEMNITY COMPANY, THE HOME INDEMNITY COMPANY, INSURANCE COMPANY OF NORTH AMERICA, AND FIRST STATE INSURANCE COMPANY, DEFENDANTS-RESPONDENTS, AND NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, AND FEDERAL INSURANCE COMPANY, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 1996.
Decided July 22, 1996.
*485 Before Judges SHEBELL, STERN and NEWMAN.
Thomas E. Mesevage argued the cause for appellant, F.L. Smidth & Co. (Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys; Robert D. Chesler, of counsel; Mr. Mesevage and Eileen M. Clark, on the brief).
Susan D. Colatsky argued the cause for respondent, Insurance Company of North America (White and Williams, attorneys; Ms. Colatsky and Michael S. Olsan, on the brief).
John M. Bowens argued the cause for respondent, First State Insurance Company (Purcell, Ries, Shannon, Mulcahy & O'Neill, attorneys; James N. Welsh, III, on the brief).
Harry M. Baumgartner argued the cause for respondents, The Travelers Insurance Company and the Travelers Indemnity Company (Shanley & Fisher, attorneys; James M. Altieri, of counsel, and on the brief; Mr. Baumgartner, on the brief).
Michael H. Cohen argued the cause for respondent, The Home Indemnity Company (Morgan, Melhuish, Monaghan, Arvidson, Arbutyn & Lisowski, attorneys; Mr. Cohen, of counsel, and on the brief).
*486 Karen L. Jordan, Deputy Attorney General, argued the cause amicus curiae, for Department of Environmental Protection (Deborah T. Poritz, Attorney General of New Jersey, attorney; Mary C. Jacobson, Assistant Attorney General, of counsel; Ms. Jordan, on the brief).
Steven Jakubowski argued the cause for defendant, Federal Insurance Company (Mr. Jakubowski, on the letter-brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
In this appeal, plaintiff, F.L. Smidth & Co., filed an action for a declaratory judgment against its insurers, defendants Federal Insurance Company ("Federal"), Insurance Company of America ("INA"), Home Indemnity Company ("Home"), Travelers Insurance Company and Travelers Indemnity Company ("Travelers"), First State Insurance Company ("First State") and National Union Fire Insurance Company ("National Union"), seeking indemnification of defense expenses and the costs of pollution remediation after it had been sued by a purchaser of its prior manufacturing site. The trial judge having concluded that there was no evidence that the contaminated groundwater migrated off-site, held that the "owned property" and "alienated property" exclusions barred coverage for the costs of remediating the groundwater pollution beneath the site. Plaintiff appeals, and we reverse.
Between 1956 and 1982, Smidth owned and operated a gear manufacturing plant in Hunterdon County. The site consisted of eighty-five acres, approximately thirteen acres of which housed the manufacturing facilities. The remainder consisted primarily of undeveloped agricultural land. In October 1982, Smidth sold the site to Cincinnati Gear Company which transferred the site in 1987 to another corporation named Cincinnati Gear Company. Both companies will collectively be referred to as "Cincinnati." The second transfer triggered the provisions of the Environmental Cleanup Responsibility Act (ECRA), N.J.S.A. 13:1K-6 to -13, now known as the Industrial Site Recovery Act, or ISRA.
*487 Cincinnati hired Malcolm Pirnie, Inc. (Pirnie), an environmental engineering company, as its consultant for compliance with ECRA. According to Pirnie, the necessary ECRA investigations were done in four phases. During Phase I, in 1987, Cincinnati submitted its General Information Submission ("GIS") and Site Evaluation Submission (SES), which identified eight areas of environmental concern (AEC), and proposed the installation of monitoring wells and the taking of soil samples. After a DEP walk-through, the number of areas was increased to thirteen, and DEP conditionally approved the SES sampling plan. During Phase II, the data was collected and analyzed, and presented to DEP in December 1988 in the form of a sampling plan addendum. In February 1989 DEP approved the addendum. In Phase III, DEP issued a conditional approval of the cleanup plan, but directed "delineation of ground water contamination in AEC 1." Between October 1989 and April 1990, additional wells were installed, bringing the total number to sixteen. During Phase IV, the subsequent investigation of AEC 1 led to a suspicion that the area at one time was used as a "burial trench." In November 1990, Cincinnati presented the results of this investigation to DEP.
Groundwater contamination at the site consisted of volatile organic compounds (VOCs) found in AEC 1 and AEC 7. VOCs detected in AEC 1 and AEC 7 included 1-1-dichloroethane, 1,1,1-trichloroethane, chlorethane, 1,2-dichloroethane, 1-2-dichloroethylene, trichloroethylene and chloroform. Pirnie detected additional areas of soil contamination and proposed remediation for nine of the thirteen areas of environmental concern.
AEC 1 was located in the southeastern portion of the property and had been a major storage area for cutting lubricating oils at the facility. AEC 7 consisted of two inactive, 500-gallon underground tanks previously used to store kerosene, but filled with sand in 1989 and abandoned. AEC 1 required remediation "for the VOCs contained in the shallow ground water, and in the fractured bedrock from 25 to 60 feet below grade." Pirnie proposed *488 to further monitor the groundwater in AEC 7 after the tanks were removed.
According to Pirnie, the "pathways of exposure for the contaminated ground water arise from the use of ground water in the contaminated zone by potential receptors downgradient of the site and from the use of water from surface water bodies which receive the ground water discharge from the contaminated zone." As part of its feasibility study, Pirnie proposed a groundwater remediation technique utilizing "air stripping" to remove VOCs from the contaminated groundwater. Describing this method of remediation as safe for the environment, effective and cost efficient, Pirnie calculated the capital cost of the system at $157,000, and the annual operation and maintenance costs at $57,000.
Meanwhile, in 1989, Cincinnati filed an action against Smidth under 42 U.S.C. § 9613(b) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") seeking reimbursement for cleanup costs, including groundwater contamination. In April 1992 Cincinnati settled its claims with Smidth for $1.8 million. During that litigation, Cincinnati and Pirnie agreed that as of May 1991, contaminated groundwater had not migrated off site, and groundwater remediation had not begun. Nevertheless, between 1988 and 1991 one on-site well down-gradient from AEC 1 "seem[ed] to be increasing ... [in] contamination," thus supporting the conclusion that contamination was moving toward property boundaries. Pirnie believed that the groundwater pollution had been caused by the soil contamination, and the cleanup plan called for remediation of such soil. In the 1991 opinion of Smidth's expert, the contamination in AEC 1 "represent[ed] a relatively recent release," probably within the prior four to six years.
In June 1992, Pirnie reported to DEP that remediation of over 2000 cubic yards of earth had been completed and that the ensuing groundwater monitoring results "show[ed] a significant decrease in the contaminant levels in the ground water samples." The report stated that further testing of the groundwater samples was *489 to follow, and that if the "results continue to decline" it would make a proposal to DEP for "ground water treatment." According to DEP, it "is still evaluating [Pirnie's June 1992 proposal as to]... subsequent rounds of sampling." However, it appears that to date DEP has not ordered groundwater remediation. Between 1964 and 1986 defendant insurers provided both CGL and excess liability coverage to various degrees. Under the CGL policies issued by Travelers, the company agreed to pay "all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence...." An "occurrence" was "an accident, including injurious exposure to conditions, which results, during the policy period, in ... property damage neither expected nor intended from the standpoint of the insured." "[P]roperty damage" meant "injury to or destruction of tangible property." "Damages" included damages for the loss of use of property. Specifically excluded from coverage was property damage "to property owned or occupied by or rented to the insured or held by the insured for sale or entrusted to the insured for storage or safekeeping." The primary policies also excluded "property damage to premises alienated by the named insured arising out of such premises or any part thereof."
Under the excess policies, Travelers agreed to "indemnify the insured for all sums which the insured shall become obligated to pay by reason of the liability imposed by law upon the insured, or assumed by the insured, under any contract, for damages in excess of the retained limit because of ... property damage to which this policy applies." Exclusion (f) made the policy inapplicable "to property damage to (1) property owned by the insured, [or] (2) premises alienated by the named insured arising out of such premises or any part thereof...."
The Home and National Union CGL policies each provided identical "owned property" exclusions, excluding coverage for property damage to:
(1) property owned or occupied by or rented to the insured,

*490 (2) property used by the insured, or
(3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control;
but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the named insured;
....
Both the Home and National Union polices also excluded coverage for "property damage to premises alienated by the named insured arising out of the use of such premises or any part thereof."
The Federal excess policies excluded "property damage to (1) property owned by the insured. ..." The First State excess policies excluded coverage for "property owned by ... rented to, occupied by or used by, or in the care, custody or control of an insured." The INA excess policies included essentially the same "owned property" exclusion as did the First State policies.
Defendant, Travelers, although not conceding that there was any groundwater pollution by plaintiff while its policies were in effect, argues that the "owned property" exclusion was clear and unambiguous and barred coverage. It claims that plaintiff's possessory interest in the groundwater beneath the site was sufficient to trigger the exclusion. It also contends that because plaintiff was not the subject of an ECRA order or directive but was merely the predecessor in title to Cincinnati Gear  the entity which was the subject of ECRA responsibilities  plaintiff faces no claim for damages sufficient to otherwise implicate coverage. Finally, it argues that the policy's "alienated property" exclusion also barred coverage. Home, First State and INA all contend that their policies' owned property exclusions also barred coverage. Because there was no evidence that any groundwater contamination had migrated off site, they all argue that the mere threat of future off-site migration, even if imminent, is insufficient to trigger coverage under State, Dept of Envtl. Protec. v. Signo Trading Int'l, Inc., 130 N.J. 51, 64, 612 A.2d 932 (1992). This argument was the basis for the Law Division's ruling.
*491 We reverse based on our holding in Morrone v. Harleysville Mut. Ins. Co., 283 N.J. Super. 411, 419-20, 662 A.2d 562 (App.Div. 1995), that groundwater contamination is not excluded by the "owned property" exclusion in CGL policies. See also Reliance Ins. Co. v. Armstrong World Indus., 292 N.J. Super. 365, 678 A.2d 1152 (App.Div. 1996). We also hold that Cincinnati's action against Smidth does represent a potential claim for damages under the polices. The policies provided for coverage against "property damage which occurs during the policy period," thus, it is not dispositive that Smidth had sold the property to Cincinnati. Smidth's complaint for damages as a result of CERCLA liability falls within the Supreme Court's holding extending coverage under such policies to "environmental response costs and remediation expenses." Morton Int'l, Inc. v. General Acc. Ins. Co. of Am., 134 N.J. 1, 27, 629 A.2d 831 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994).
The record, however, fails to indicate the degree to which groundwater was polluted by Smidth during the policy periods, and the extent to which environmental response costs were a result of the groundwater pollution as opposed to soil pollution by Smidth. Under Signo, supra, the costs of remediating the soil pollution causing the groundwater contamination may be covered. 130 N.J. at 64, 612 A.2d 932. The proofs here do not adequately address this issue.
The INA, First State and Home policies contain exclusions for property damage to property "used by" or in the "care, custody or control of" the insured. Our conclusion that Smidth did not "own" the groundwater beneath its site, leads us to further hold that it did not "use" or hold the groundwater in its "care, custody or control." We find no evidence that there was any such intent on the part of the insured, and we find nothing in the exclusion to cause us to hold that an insured has "used" groundwater on the premise that it misused the groundwater by contaminating it.
*492 The Travelers and Home policies expressly provided exclusions for premises alienated by the insured. The record is not clear as to whether such an exclusion was in the First State or INA policies. In any event, the "alienated property" exclusion merely extends the "owned property" exclusion for property transferred by the insured. The alienated property exclusions would apply to the same extent as the owned property exclusions, no further, and here the "owned property" exclusions are not applicable as to groundwater contamination.
Reversed and remanded.
Judge STERN concurs for the reasons expressed in his concurring opinion in Reliance Ins. Co. v. Armstrong World Indus., 292 N.J. Super. 365, 678 A.2d 1152 (App.Div. 1996).