293 N.J. Super. 81 (1996)
679 A.2d 709
EDWARD P. SAGENDORF, CARMELLA SAGENDORF, ED'S HICKORY TREE SERVICE CENTER, INC., D/B/A GREEN VILLAGE GARAGE, PLAINTIFFS-APPELLANTS,
v.
SELECTIVE INSURANCE COMPANY OF AMERICA, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 15, 1996.
Decided July 22, 1996.
*83 Before Judges SHEBELL, STERN and NEWMAN.
Carl R. Woodward, III argued the cause for appellants (Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein, attorneys; Mr. Woodward, Walter G. Luger, and Kevin L. Leahy, on the brief).
*84 Martha N. Donovan argued the cause for respondent (Norris, McLaughlin & Marcus, attorneys; Ms. Donovan, on the brief).
Laura Foggan (pro hac vice) of Wiley, Rein & Fielding and Wendy L. Mayer argued the cause amicus curiae for Insurance Environmental Litigation Association (Smith, Stratton, Wise, Heher & Brennan, attorneys; Ms. Foggan, John E. Barry, and Treg A. Julander, of counsel; Ms. Mager, on the amicus curiae brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
Plaintiffs, Edward P. Sagendorf and Carmella Sagendorf, owned a gasoline service station known as Green Village Garage and were insured under three policies issued by defendant, Selective Insurance Company of America (Selective): a comprehensive general liability (CGL) policy; a "garage" policy; and an umbrella policy. In 1985 when plaintiffs were replacing their underground tanks, DEP became involved during the course of the excavation, and ultimately cited plaintiffs under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.11z, after evidence of gasoline was discovered in the excavation and in the excavated soil. Tests performed on the groundwater beneath the site indicated that groundwater was affected by the contamination. Plaintiffs subsequently complied with some, but not all, of DEP's strictures as to monitoring and remediating the contamination.
In 1987, about two years after the excavating, plaintiffs first notified Selective, who ultimately denied coverage. Coverage was denied because: the CGL policy excluded insurance for "garage operations"; the expenses of cleanup incurred by reason of the DEP directive were not "damages" under the other policies; and the "owned property" exclusion barred coverage for injury to plaintiffs' own site. Plaintiffs instituted this action in April 1990 seeking a declaration of coverage. Summary judgment for defendant was granted in December 1994 based on the holding that the policy exclusions barred coverage, and plaintiffs' notice to defendant was untimely from which defendant suffered prejudice.
*85 In December 1976, plaintiffs purchased a service station and garage located at 526 Green Village Road in Harding Township. The service station, operated as Green Village Garage, included three underground fuel tanks and a waste oil tank. Also on the property were a house that plaintiffs leased to tenants, and a shed. The tenant house was heated from an above-ground tank. According to Ed Sagendorf, at the time plaintiffs bought the property he did not believe that he was purchasing water or anything else beneath the property except the tanks. Nevertheless, the deed plaintiffs were given indicated that the property being conveyed included "all and singular the trees, ways, waters, profits, privileges and advantages with the appurtenances to the same belonging or in any way appertaining."
At the time plaintiffs purchased the property, the Sagendorfs did not inspect or test the underground tanks. Mr. Sagendorf would routinely check for water inside them by "using detect paste on the stick" measuring the amount of fuel in the tanks. Between 1976 and 1985 his routine tests turned up minor problems with water, caused by a rainfall, but no problems with losing product from the tanks.
In 1984 the company supplying plaintiffs with gasoline performed a "leak test" on each of the three underground gasoline tanks. According to plaintiffs, the tanks passed, and the company continued providing fuel. During 1985, a tank began having a problem with water. Because of this, changing environmental laws, and the upcoming termination of their contract for gasoline supply, plaintiffs decided to replace the three tanks. They hired a contractor, H.A. Ferrot, and removal began in June. Ferrot advised that, upon excavation, if there was evidence of a spill or leak the State would have to be notified.
June 6, 1985, the day of the excavation, it rained and neither Sagendorf nor DEP was present during the digging. That night, when Sagendorf inspected the hole, he "saw white absorbenates ... in the ditch, in the open hole, ... [and] a sheen on the water [,] and the one corner looked kind of dark and gooey." He did not *86 know who, if anyone, had examined the tanks as they were removed. He also did not know where the tanks were taken.
The next day, when Sagendorf arrived to open the station, a representative of DEP was waiting for him. Debra Moccia, one of two DEP officials responding to the site, reported that upon arriving on the scene she "had observed a gasoline odor and a sheen on the water which had accumulated in the excavated pit." She ordered that work at the site be halted. Late that day she allowed excavation to continue, observing that Ferrot's employees were using "absorbent pads" to collect the fluid in the pit. Ferrot had already removed the soil from the excavation to another site, but upon examining it, Moccia noted that a soil test measured "70 ppm organics," and directed that it be "classified for proper disposal." She also directed that it not be used as clean fill, and Ferrot transported the soil back to the site and piled it behind the station. Moccia then issued Ferrot a field notice of violation for not disposing of a solid waste at a licensed facility. At Moccia's suggestion, Sagendorf pumped the remaining excavation fluid into one of his new tanks, and Moccia told him to install a monitoring well at the place where she had "observed product leaching into the pit."
On July 8, 1985, Moccia met with Sagendorf at the station. In the interim the new "tank field had been installed and was covered with a concrete pad." According to Moccia, Sagendorf had had Ferrot "leave the metal corrugated pipe in place as a site well although he knew this could not serve as a monitoring well per state specifications." There was "no visual product on the water" at the bottom of the site well but Moccia detected "a strong gasoline odor." She wanted a proper monitoring well installed and the excavated soil to be tested in order to confirm whether groundwater contamination had occurred or whether what they had seen in the pit had merely "leaked out of the old lines or from one of the excavated tanks that had not been emptied completely" upon excavation. Although Moccia's understanding of standard DEP policy in these cases was to require not one but four *87 monitoring wells, she directed Sagendorf to install only one such well because she had witnessed the "rough" manner in which Ferrot's employees were handling the tanks and believed that such handling of tanks or lines containing residual product might explain the presence of the gasoline in the pit.
By January 1986 Sagendorf had not properly disposed of the excavation soil from behind the station or installed any additional monitoring wells. Soil samples showed that the dirt removed from the excavation "had contamination in it." Accordingly, on January 8, 1986, DEP issued a directive letter to plaintiffs, as noted above, asserting that during the summer of 1985 "an unknown amount of hazardous substance (petroleum hydrocarbons) was discharged on the site from an underground storage tank, on the [subject] property, onto the lands of the State." The letter further directed the Sagendorfs to submit, among other things, a soil contamination investigation plan and a groundwater contamination investigation plan, or they would risk triple penalties. Mr. Sagendorf told a DEP representative he would "have his lawyer look it over," however, defendant was not notified of the letter at that time.
On February 21, 1986, Sagendorfs not having responded to the directive letter, DEP issued an internal memo itemizing costs "for monies to be expended at Green Village Sunoco." Pursuant to another internal memo of February 25, 1986, DEP concluded that monies from the Spill Fund might have to be used, saying that the "unwillingness of the responsible party to initiate a groundwater investigation after 8.0 months indicates an abandonment of responsibility and thus shows a need for public funds to be dispensed to address groundwater investigation." DEP felt that four monitoring wells needed to be installed to "investigate and delineate groundwater contamination" in order to determine whether or not groundwater remediation would be necessary.
According to a DEP official who spoke with the Sagendorfs' attorney during this period, Sagendorf would "possibly pay for clean-up if he can get bids [and] check prices." In April 1986, *88 DEP requested in writing that plaintiffs confirm what remediation they planned for the site. Plaintiffs' counsel responded that they intended "to undertake corrective action" but were still considering the "most cost-effective means."
In July 1986 plaintiffs' environmental consultant, HQM/Ragold, Inc. ("HQM"), issued a technical sampling work plan for the site. One of the objectives was to determine the extent of any "possible groundwater contamination." In October 1986, the first groundwater samples were taken. HQM's March 1987 report entitled "Groundwater Evaluation and Remediation Program for Green Village Garage," related that the samples had been collected from five on-site monitoring wells installed in July. According to the test results, the report concluded that "groundwater contaminants above drinking water standards exist on-site and corrective actions need to be taken to remediate the situation." The report also noted that possible causes for the contaminants of wells numbers one, two and five were the accidental lifting and rupture of the fuel line from the tanks at the time of excavation, as well as a potentially leaking storage tank indicated by the fact that one of the three tanks removed had been "taking on water" prior to removal. While a fourth well (well three) also showed elevated concentrations of contaminants, the report attributed these to runoff from "[t]ypical parking lot conditions" associated with "cars needing servicing ... temporarily parked in this area." HQM recommended to "pump and treat the groundwater in order to restore it to its background condition." HQM also proposed installing two additional groundwater monitoring wells on site and, depending upon future test results, possibly a third off-site. In plaintiffs' counsel's April 1987 letter of transmittal by which they forwarded a copy of the report to DEP, they represented that they were "prepared to undertake promptly a remediation program," and requested approval of their plan.
On August 24, 1987, DEP responded that it believed four or five additional monitoring wells were necessary "to better understand the dissolved gasoline plume extending from the site," and that *89 three such wells should be installed off-site. It requested other information and directed plaintiffs to perform additional sampling. The additional wells mentioned in the HQM groundwater plan were not installed because, according to the Sagendorfs, DEP "never pressed" the issue. Plaintiffs did no further remediation after 1987.
On August 31, 1987, or approximately a week following DEP's response to plaintiffs regarding their submission of the HQM groundwater report, plaintiffs first notified Selective of the DEP Spill Act directive. As of that date, plaintiffs had incurred expenses of about $12,000 "to study and remediate the conditions at the site," and notified defendant that the "drilling of the wells cost approximately $7,500". Plaintiffs claimed coverage under their policies for "investigative costs incurred to date and for any further costs for investigation and remediation which may be incurred," as well as the costs of defense.
Between January 1985 and January 1986, defendant insured plaintiffs under the three separate policies mentioned above: comprehensive, garage and umbrella. The CGL policy had an exclusion for bodily injury or property damage "arising out of any service station operations" exclusive of snow plowing. The garage policy covered bodily injury or property damage "to which this insurance applies caused by an accident and resulting from garage operations." An accident included "continuous or repeated exposure to the same conditions resulting in bodily injury or property damage the insured neither expected nor intended." "Garage operations" included
the ownership, maintenance or use of locations for garage business and that portion of the roads or other accesses that adjoin these locations. Garage operations includes the ownership, maintenance or use of the autos indicated in PART II as covered autos. Garage operations also include all operations necessary or incidental to a garage business.
"Property damage" meant damage to or loss of use of tangible property. Among the exclusions was property damage "to property owned or held for sale or being transported by the insured or in the insured's care, custody or control." Also excluded was *90 property damage "caused by the dumping, discharge or escape of irritants, pollutants or contaminants" if not sudden and accidental.
The policy required that the insured "promptly notify us or our agent of any accident or loss." A "loss" meant "direct and accidental loss or damage." The insured was also obligated to cooperate with the company in the "investigation, settlement or defense of any claim or suit," and was enjoined from "voluntarily mak[ing] any payment, assum[ing] any obligation or incur[ring] any expense" except at the insured's "own cost." Also, the insured was required to "[i]mmediately send [the company] copies of any notices or legal papers received in connection with the accident or loss."
The umbrella policy expressly provided coverage for property damage "caused by or arising out of an occurrence happening anywhere in the world." "Property Damage" meant
(1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom; or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
An "occurrence" was "an accident, including continuous or repeated exposure to conditions, which results in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured." An exclusion captioned "property damage to real property" provided that the policy did not apply to liability for property damage to real property: 1) owned or occupied by or rented to the insured; 2) used by the insured; or 3) in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control.
One of the conditions of coverage was entitled "notice of occurrence":
Whenever it appears that an occurrence is likely to involve indemnity under this policy, written notice thereof shall be given to the company or any of its authorized agents as soon as practicable.

*91 Such notice shall contain particulars sufficient to identify the insured and also reasonably obtainable information respecting the time, place and circumstances of the occurrence, the names and addresses of the injured and of available witnesses.
In an additional section captioned "assistance and cooperation of the insured," the policy provided:
The company shall have the right and shall be given the opportunity to associate with the insured or its underlying insurers, or both, in the defense and control of any claim, suit or proceeding which involves or appears reasonably likely to involve the company and in which event the insured, such insurers and the company shall cooperate in all things in defense of such claim, suit or proceeding.
On October 26, 1987, defendant informed plaintiffs it was denying coverage because the CGL policy's exclusion for "service station operations," precluded coverage under that policy. It said there was no coverage under the garage policy because the costs incurred in response to the DEP directive did not fall within the "property damage" or "accident" definitions. Additional reasons given for coverage denial included the "owned property" exclusion, the exclusion for discharge of pollutants, and the fact that relief from the costs of cleanup mandated by the State was equitable in nature. The denial letter said nothing about coverage under the umbrella policy or plaintiffs' failure to make a timely claim under the terms of the policies.
In 1992 plaintiffs received a further environmental site assessment from HQM. The five on-site monitoring wells had been sampled on July 7, 1992, and volatile organic compounds associated with gasoline were "quantified in groundwater" "in the south and southeast portion [sic] of the site," but the "presence of floating product was not noted on the water from any of the wells tested." In June 1993, Dewling Associates, Inc., issued an initial report on the site that stated:
The files reviewed provided extremely limited information regarding actual off-site movement of the groundwater contamination. A single up-gradient off-site water supply well (at "the Deli") was checked for contamination. No indication of the contamination similar to that from the Green Village Garage was encountered at this up gradient location. No other sampling of off-site wells has yet occurred. The NJDEP had directed in 1986 that groundwater monitoring wells be installed in "... the surrounding area(s), designed to delineate the nature and extent of possible groundwater contamination by the unauthorized discharge...."
*92 However, the report concluded that "[c]ontamination of groundwater on adjoining property is likely, and may have already occurred."
In May 1994, a DEP geologist reviewed portions of DEP's file as part of his work for the Bureau of Underground Storage Tanks. He concluded, based upon the information in the file, that there had been "an observed impact to the ground water" of the site. He believed that, as a result, two nearby surface streams "could potentially be impacted" as well. In addition, based upon the location of the site's monitoring wells, the contamination levels in the wells and the groundwater flow, he had "strong[] ... concerns" that "in the future off site ground water ... might be affected." In his opinion, based on the past sampling, off-site groundwater may have been impacted beginning in 1986 or 1987, and perhaps even earlier.
In June 1994, plaintiffs' counsel wrote defendant that during the spring of 1992 the New Jersey American Water Company "discovered" "petroleum hydrocarbons/gasoline contamination" on the property adjacent to plaintiffs'. Since Sagendorf "personally observed the blackened petroleum hydrocarbons/gasoline and smelled the odor of gasoline from the excavation/repair site," according to counsel's correspondence, the "blackened petroleum hydrocarbons/gasoline apparently migrated off-site from the Green Village property."
According to defendant, it never had the opportunity to inspect the tanks or the excavations, and had defendant been presented with the chance, it might have inspected the tanks. The Law Division judge concluded that the Sagendorfs "probably should have known on or within a few days after [June 24, 1985] ... that [they] had a problem with liability ... for this spill in terms of the State requiring remediation activity." Moreover, thereafter they had ongoing contact with DEP that "pointed in the direction of imposing remedial responsibility on [them]." The judge found that plaintiffs' failure to notify defendant was "significant" in that it violated the provisions of the policy, and regarding the creation *93 of prejudice, noted: "There ... are many things that [Selective] might have wanted to do by way of exploration, evaluation, and perhaps even limited remediation to protect its own [interests]." The judge ruled that plaintiffs' delay in notifying defendant thus put it in exactly the opposite position from that which it bargained for. The judge entered summary judgment for defendant on the ground of failure to give proper notice.
A carrier may not decline coverage "unless there are both a breach of the notice provision and a likelihood of appreciable prejudice. The burden of persuasion is the carrier's." Cooper v. Government Employees Ins. Co., 51 N.J. 86, 94, 237 A.2d 870 (1968) (footnoted omitted). In Morales v. National Grange Mut. Ins. Co., 176 N.J. Super. 347, 355-56, 423 A.2d 325 (Law Div. 1980), the Law Division articulated two "variables" in "resolving whether appreciable prejudice exists":
The first pertains to whether substantial rights have been irretrievably lost by virtue of failure of the insured to notify the carrier in a timely fashion. In this regard it is to be emphasized that the carrier must establish more than the mere fact that it cannot employ its normal procedures in investigating and evaluating the claim....
The second factor considered by most courts in determining whether appreciable prejudice exists pertains to the likelihood of success of the insurer in defending against the accident victim's claim.
Rule 4:46-2 states that a court must grant summary judgment when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Our Supreme Court has directed that the determination be made as follows:
[T]he determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party. This assessment of the evidence is to be conducted in the same manner as that required under Rule 4:37-2(b) [i.e., involuntary dismissal at trial].
[Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995).]
*94 Thus, "[a] non-moving party cannot defeat a motion for summary judgment merely by pointing to any fact in dispute," but rather must come forward with evidence that creates a genuine issue as to a "material fact," at which point the judge then applies the R. 4:37-2(b) standard (i.e., whether the presentation of all of the plaintiff's evidence including the legitimate inferences therefrom could sustain a judgment in the plaintiff's favor). Id. at 529, 666 A.2d 146. On appeal of a grant or denial of summary judgment, we apply the same standard applied by the trial judge. Allstate Redevelopment Corp. v. Summit Assoc. Inc., 206 N.J. Super. 318, 327, 502 A.2d 1137 (App.Div. 1985).
The garage policy required plaintiffs to "promptly notify [defendant] ... of any accident or loss" and refrain from making investigations or settlements voluntarily. They also had to "[i]mmediately send" defendant copies of "notices or legal papers received in connection with the accident or loss." The umbrella policy required written, particular notice "[w]henever it appears that an occurrence is likely to involve indemnity under this policy ... as soon as practicable."
The spill or spills stemming from the tank excavation occurred on June 6, 1985. During the following month, DEP informed Sagendorf of the violations and the potential contamination problems. On January 8, 1986, DEP issued its Spill Act directive, but it was not until August 31, 1987, over a year and a half following the directive, and over two years after the excavation, that plaintiffs notified defendant.
Plaintiffs say that the notice defendant received met the "as soon as practicable" requirement. The phrase "as soon as practicable" has been construed in New Jersey to mean "within a reasonable time," Figueroa v. Puter, 84 N.J. Super. 349, 354, 202 A.2d 195 (App.Div. 1964), which "depends on the facts and circumstances of the particular case, and is ordinarily a factual issue for resolution by the jury unless the facts are undisputed and different inferences cannot reasonably be drawn therefrom." Bass v. *95 Allstate Ins. Co., 77 N.J. Super. 491, 495, 187 A.2d 28 (App.Div. 1962). The mere lapse of time "is not determinative." Ibid. Thus, in one case a delay in notification of three weeks from the accident could be deemed unreasonable under the circumstances, Miller v. Zurich Gen. Acc. and Liability Ins. Co., 36 N.J. Super. 288, 296-97, 115 A.2d 597 (App.Div. 1955), but in another case a six-year delay in notification could create a fact question about prejudice to the carrier. Hatco Corp. v. W.R. Grace & Co., 801 F. Supp. 1334, 1371-73 (D.N.J. 1992).
Plaintiffs' failure to notify defendant before August 1987 of its potential liability for monitoring or remediating the site was unreasonable under the circumstances. As early as January 1986, DEP had issued its Spill Act directive and by April 1986, plaintiffs' counsel was telling DEP that plaintiffs intended "to undertake corrective action" and were considering their options. By July, plaintiffs had already engaged an environmental consultant. Nonetheless, plaintiffs fail to offer an explanation as to why they delayed notifying defendant. Thus, we conclude plaintiffs failed to provide the timely notice required in the policies.
This, however, does not relieve defendant of its obligation to show that plaintiffs' delay caused it to irretrievably lose substantial rights and undermined the "likelihood that it would have had a meritorious defense had it been informed of the accident in a timely fashion" (footnote omitted). Morales, supra, 176 N.J. Super. at 355-56, 423 A.2d 325. Defendant refers to possible "scientific and factual questions about the nature of the spill, [and] the extent to which it might be spreading," however, it fails to explain how such considerations create material issues as to prejudice it suffered from any late notice. Defendant asserts the destruction of the tanks, plaintiffs' failure to properly remediate the site, and the lost opportunity "to take a `snapshot' of the contamination at the critical moment" "robbed [it] of the chance to protect itself from this very litigation and/or the chance to curtail [plaintiffs'] self-inflicted exposure to NJDEP sanctions." However, the questions of whether the policy covers groundwater pollution and *96 remediation for DEP directives are coverage issues that are not affected by plaintiffs' late notice. As for the pollution itself, defendant does not allege that either on- or off-site pollution was caused by some other source besides the inground tanks, the manner of their excavation in June 1985 or drippings from cars parked on-site, and as between those potential causes it does not argue that one might be covered while the others would not be.
Defendant has had the benefit of the various DEP tests as well as the consulting tests and studies, and fails to point to anything to indicate they were unreliable on the groundwater pollution issue. Concerning the lost opportunity to have been able to "inspect the tank," it is something defendant might have done, not something that it would have done. The window of opportunity for such inspection or even of photographing the site does not appear to have been sufficient on these facts even if notification was immediate. Defendant has pointed to no expert or other evidence  beyond speculation  linking plaintiffs' failure to give it earlier notice with any resultant prejudice. It fails altogether to identify a likely circumstance detrimentally affecting a successful defense on the merits of the remediation expenses. Morales, supra, 176 N.J. Super. at 355-56, 423 A.2d 325.
We reject defendant's argument that the notice considerations applicable in an environmental matter are much more akin to those where the insured sought to recover under a thoroughbred mortality policy, as in Stables v. American Live Stock Ins. Co., 201 N.J. Super. 492, 496, 493 A.2d 584 (App.Div. 1985). In Stables, the court held that a policyholder's breach of the policy's notice requirement precluded recovery without requiring the insurer to prove that it was appreciably prejudiced by untimely notice of the horse's infirmity, as immediate notice was required. Ibid. Subsequent to our holding in Stables, supra, we upheld, in an action for insurance coverage for costs of an environmental cleanup, the proposition that an insurer's late-notice defense "cannot be sustained unless the carrier satisfies the burden of proving that it suffered appreciable prejudice by reason of the insured's failure to *97 comply." Solvents Recovery Srv. of New England v. Midland Ins. Co., 218 N.J. Super. 49, 54, 526 A.2d 1112 (App.Div. 1987). We conclude the granting of summary judgment to defendant was not warranted, and that nothing on this record prevents the grant of summary judgment to plaintiffs on the notice issue. Brill, supra, 142 N.J. at 529, 666 A.2d 146. We, therefore, do not address plaintiffs' argument that defendant's failure to mention in its disclaimer-of-coverage letter the defense of untimely notice estopped it from later avoiding coverage on that ground.
Defendant maintains that the policies do not cover damage to groundwater because groundwater was either owned by the insured or was within the insured's care, custody or control, thereby falling within a coverage exclusion. There was evidence below that the site excavation, leaking tank, negligent removal of tank lines or drainage from the site's parking lots led to contamination of groundwater beneath plaintiffs' site. Whether or not contaminated groundwater migrated off-site, we conclude that coverage for the monitoring or remediation of such groundwater contamination was not barred by either the "owned property," property "used by" or property in the "care, custody or control of" the insured exclusions. Reliance v. Armstrong, 292 N.J. Super. 365, 678 A.2d 1152 (App.Div. 1996); Morrone v. Harleysville Mut. Ins. Co., 283 N.J. Super. 411, 662 A.2d 562 (App.Div. 1995).
The garage policy specifically excluded property damage "to property owned or held for sale or being transported by the insured or in the insured's care, custody or control." The umbrella policy excluded coverage for property damage to real property "owned ... by ... the insured," "used by the insured" or in the "care, custody or control of the insured or as to which the insured is for any purpose exercising physical control." We find these exclusions inapplicable, as there is no indication the plaintiffs intended to use or exercise control over the groundwater.
The DEP directive required plaintiffs to submit a soil contamination investigation plan and a groundwater contamination investigation plan, or risk triple penalties. The expenses of *98 monitoring the site's groundwater  and any groundwater remediation made necessary as a result  were "damages" based on our Supreme Court's holding that "environmental-response costs" are "damages" under the typical CGL policy. Morton Int'l v. General Accident Ins. Co., 134 N.J. 1, 27, 629 A.2d 831 (1993), cert. denied, ___ U.S. ___, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994). The garage and umbrella policies at issue here present no basis, and the parties do not offer one, to interpret "damages" differently.
However, even if the costs of investigating and monitoring groundwater are "damages" and, therefore, covered expenses under the policies, other costs associated with remediating the site, for example soil excavation and fill, are not considered covered damages except to the extent that they are deemed costs reasonably associated with groundwater remediation, as the insured's soil is clearly not third-party property. See State, Dep't of Envtl. Protec. v. Signo Trading Int'l, Inc., 130 N.J. 51, 63, 612 A.2d 932 (1992). As we noted in our holding in Kentopp v. Franklin Mutual Ins. Co., 293 N.J. Super. 63, 679 A.2d 701 (App.Div. 1996):
It may be that the issue warrants reconsideration in light of the subsequent holding in Morton, supra. The troubling decisions to be made as to when clean-up is required and the difficulty in apportioning the costs of clean-ups appear to militate against barring recovery for environmental clean-up at the source of the contamination. There would appear to be some basis for the position that, just as with groundwater, contamination of soil will ultimately end up endangering the health or property of others, and while damage to owned property may have occurred, the recovery sought is not for that damage, but to prevent damage to others and their property. Thus, while the contamination involves owned property, the covered damages would be for the purpose of preventing harm to third parties.
[293 N.J. Super. at 78, 679 A.2d at 707.]
We conclude that plaintiffs' claims for coverage of the expenses of monitoring or remediating the groundwater pollution are not barred by the policy exclusions presented to us.
We reverse and remand for further proceedings.
*99 Judge STERN concurs for the reasons expressed in his concurring opinion in Reliance v. Armstrong, 292 N.J. Super. 365, 678 A.2d 1152 (App.Div. 1996).