874 A.2d 591 (2005)
378 N.J. Super. 59
John A. GAZIS, Plaintiff/Appellant,
v.
Fred B. MILLER and Archdiocese of Newark, Defendants/Third-Party Plaintiffs,
v.
The National Catholic Risk Retention Group, Inc., Third-Party Defendant/Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted April 19, 2005.
Decided June 6, 2005.
*592 Ryan, Brown, McDonnell, Berger & Gibbons, attorneys for appellant (Michael T. McDonnell, III, on the brief).
Landman Corsi Ballaine & Ford, attorneys for respondent (Gerald T. Ford and Steven A. Torrini, New York, NY, on the brief).
Before Judges COBURN, WECKER and GRAVES.
The opinion of the court was delivered by
COBURN, J.A.D.
The issuer of an occurrence based excess automobile insurance policy obtained summary judgment forfeiting the insured's right to coverage based on the insured's violation of the policy's notice provision even though the violation did not cause the issuer any appreciable prejudice. We reverse because in the absence of prejudice, the contractual violation was immaterial and the ruling caused a disproportionate forfeiture.

I
On January 9, 2000, Miller was driving a car owned by his employer, the Archdiocese of Newark. While driving in Brick Township, the car collided with a pedestrian, plaintiff John Gazis, causing a severe fracture of his ankle, facial fractures, brain contusions, a subdural hematoma, and other injuries. After hospitalization and treatment in a rehabilitation center, Gazis was released in March 2000 with, among other things, permanent loss of his sense of smell and most of his sense of taste.
On the day after the accident, Miller reported the accident to Kemper National Account Service, Co. ("Kemper"), the claims servicing company that administered automobile claims for the Archdiocese under a policy of insurance issued by Lumberman's Mutual Casualty, a Kemper company, which provided occurrence based liability protection of $250,000. The Archdiocese *593 was further insured for liability under a $750,000 excess policy issued by third-party defendant, The National Catholic Risk Retention Group, Inc. ("National"). Kemper, National, and the Archdiocese had agreed that Kemper would be responsible for all appropriate notices to National, which, in turn, had reinsurance with American Re. In short, the coverage provided for one accident, was $250,000 from Kemper, then $350,000 from National, and finally $400,000 from American Re. The annual premium for the National policy was approximately $340,000. This policy provided for indemnity only and not for defense.
National is not an ordinary commercial insurance company issuing policies to the general public. Rather, it is a risk retention group operating pursuant to the Liability Risk Retention Act of 1986, 15 U.S.C.A. § 3901 to -3906, which means that it could provide liability insurance to entities engaged in similar or related activities. National's owners and insureds are its membership, approximately sixty-three dioceses and other Roman Catholic organizations throughout the United States. Its board of directors consists of representatives from those groups.
The notice of claim provision of National's policy provides, in relevant part, as follows:
[The insured] shall give written notice to the Company as soon as practicable but no more than 120 days after receiving notice of any event which ... may give rise to a covered loss irrespective of any apparent liability, when the event results in any of the following:
. . .
(2) Brain damage
(3) Multiple Injuries requiring hospitalization for more than thirty days
. . .
(7) Any loss for which the Underlying Insurer has established a reserve (including expense) of $125,000 or more.
. . .
In the event the Insured fails to provide such notice within a 120 day period after receiving notice of any event, this Policy will not apply to any such injury.
[Emphasis added.]
By April 1, 2000, Kemper knew that Gazis had retained counsel, and by October 2 Kemper was well aware of the seriousness of Gazis's injuries, had set its reserve at $275,000, and knew that it should give notice to National. Without excuse, the notice was not given until June 21, 2001. On July 11, 2001, National denied coverage for Gazis's claim based solely on the failure to give it notice within the 120 day period required by its policy.
Gazis filed his complaint in January 2002, six months after National declined coverage, and the Archdiocese impleaded National in February, demanding indemnification. On June 13, 2003, following the completion of discovery, Gazis's case was submitted to arbitration, resulting in an award of over $1 million. The Archdiocese obtained a trial de novo, and later reached a $500,000 settlement with Gazis, who received the entire Kemper policy of $250,000 plus an assignment of the Archdiocese's rights, if any, to recover the balance of $250,000 from National.
Motions and cross-motions for summary judgment were filed by National, Gazis and the Archdiocese. National relied on the Archdiocese's admitted violation of the 120 day notice provision, asserting that breach was sufficient without the presence of prejudice to support its denial of coverage. Alternatively, it asserted that the late notice had caused prejudice, relying *594 on a certification of its director of claims management, Douglas W. Grund, who made these assertions:
6. Normally, when [National] receives notice of a serious claim, such as the Gazis claim, we follow the claim very closely and work with our policyholders and/or its third party claim administrator to develop a litigation plan, identify acceptable methods of early resolution, coordinate disposition and utilize a structured settlement strategy if appropriate.
7. In my experience, our methodology of following serious claims from an early stage and working towards an early settlement and favorable resolution has resulted in more timely settlements at a more favorable rate.
8. Had we received notice of the Gazis claim when we should have, we would have followed the claim closely, and worked with Kemper, the Archdiocese, defense counsel and Mr. Gazis' attorney to resolve the liability, injury and settlement issues quickly given the serious injuries and obvious liability problems. I would have reviewed the police and hospital records from the night of the accident to establish whether or not plaintiff was intoxicated.
9. Given my experience in handling claims of this nature, I believe there is a reasonable chance that we would have settled the case for less than the $500,000 ultimately needed to settle the case. We would have emphasized to plaintiff's attorney the significant time and expenses that would be avoided by settling the case prior to suit being filed and the advantages of utilizing a structured settlement.
10. When [National] received notice of the Gazis claim on June 21, 2001, I did not engage in our normal methodology because the notice clearly violated the 120-day requirement in the Policy.
During the argument on the motions, the judge found as a fact that National had suffered no prejudice as a result of the late notice. Nonetheless, he denied the motions filed by Gazis and the Archdiocese and granted National's motion because of the late notice. He reached that result orally and in a written opinion because, in his view, the absence of prejudice was irrelevant since the parties were sophisticated, this was not a contract of adhesion, and the policy's requirement of notice within 120 days was an unambiguous condition precedent for coverage.

II
We begin our analysis, as did the Law Division judge, with Cooper v. Gov't Employees Ins. Co., 51 N.J. 86, 237 A.2d 870 (1968), where the insurance company denied coverage, despite the absence of prejudice, because its insured failed to give notice of the automobile accident "`as soon as practicable' as the [occurrence based] policy require[d]." Id. at 88, 237 A.2d 870. The Court noted that the policy also provided that "no action shall lie against the company unless `as a condition precedent' the insured shall have fully complied with all the terms of the policy, of which the notice provision is one." Id. at 91, 237 A.2d 870. And the Court observed that in Whittle v. Associated Indem. Corp., 130 N.J.L. 576, 33 A.2d 866 (E. & A.1943), "such a provision was enforced literally." Cooper, supra, 51 N.J. at 92, 237 A.2d 870. By way of further explanation, the Court said this:

Whittle approached the subject in classical contractual terms. Thus it said "the law does not make a better contract for the parties than they chose to make for themselves," and that "our `function' is to `enforce a contract as written,'" *595 and that the question was simply whether the insured fulfilled what the policy denominated "a condition precedent."
[Id. at 93, 237 A.2d 870 (citation omitted).]
Rejecting Whittle, the Court emphasized that "what is involved is a forfeiture, for the carrier seeks, on account of a breach of [the notice] provision, to deny the insured the very thing paid for." Id. at 94, 237 A.2d 870. Therefore, "it becomes unreasonable to read the provision unrealistically or to find that the carrier may forfeit the coverage, even though there is no likelihood that it was prejudiced by the breach." Ibid. Consequently, the Court held that "the carrier may not forfeit the bargained-for protection unless there are both a breach of the notice provision and a likelihood of appreciable prejudice. The burden of persuasion is the carrier's." Ibid. The Court reached that conclusion in part because this was a contract of adhesion, but also because "[i]t would ... disserve the public interest, for insurance is an instrument of a social policy that the victims of negligence be compensated." Ibid.
As pointed out by National and the motion judge, the Supreme Court has declined to extend the Cooper "appreciable prejudice" doctrine to claims made policies, Zuckerman v. Nat'l Union Fire Ins., 100 N.J. 304, 495 A.2d 395 (1985), but that is because "an extension of the notice period in a `claims made' policy constitutes an unbargained-for expansion of coverage, gratis, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy." Id. at 324, 495 A.2d 395. Far from casting doubt on the viability of Cooper, Zuckerman reaffirms Cooper's continuing viability. Id. at 322-23, 495 A.2d 395.
In Alcazar v. Hayes, 982 S.W.2d 845 (Tenn.1998), the court noted that a "vast majority of jurisdictions now consider whether the insurer has been prejudiced by the insured's untimely notice." Id. at 849 (citations omitted). The court observed that the three rationales most often given are "1) the adhesive nature of insurance contracts; 2) the public policy objective of compensating tort victims; and 3) the inequity of the insurer received a windfall due to a technicality." Ibid. After expanding on each rationale, the court added that requiring prejudice is also supported by Restatement (Second) of Contracts, which states: "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." Restatement (Second) of Contracts § 229 (1981).
In a comment to that section, also cited with approval in Alcazar, this elaboration appears:
In determining whether the forfeiture is "disproportionate," a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture. The character of the agreement may, as in the case of insurance agreements, affect the rigor with which the requirement is applied.
[Restatement of Contracts, supra, § 229 comment b.]
Applying that principle, the court found "that the notice requirement is immaterial to the insurance contract in the event that the insurer is not prejudiced. Consequently, the insured's failure to comply *596 with this requirement in such instance is excused, since a "disproportionate forfeiture" ensues." Alcazar, supra, 982 S.W.2d at 853 (citations omitted).
The prejudice requirement has been applied in cases involving both excess insurance and reinsurance despite the fact that reinsurance agreements are not contracts of adhesion. See, e.g., Unigard Sec. Ins. Co., Inc. v. North River Ins. Co. 79 N.Y.2d 576, 584 N.Y.S.2d 290, 594 N.E.2d 571 (1992)(reinsurance); Ins. Co. of Pa. v. Associated Int'l Ins. Co., 922 F.2d 516 (9th Cir.1991) (California law; reinsurance); Sec. Mut. Cas. Co. v. Century Cas. Co., 531 F.2d 974 (10th Cir.1976)(Colorado law; reinsurance); British Ins. Co. of Cayman v. Safety Nat'l Cas., 335 F.3d 205 (3d Cir.2003), (predicting that the New Jersey Supreme Court would apply Cooper to reinsurance); Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co., 275 Kan. 698, 71 P.3d 1097 (2003)(excess insurance).
In all of the cases cited so far, the policies expressed their notice requirement in such terms as "as soon as practicable," or words of similar effect. Thus, we must consider whether the presence of the specific time period in the subject policy, 120 days, should make a difference. We have found only one case on point, Hanover Ins. Co. v. Carroll, 241 Cal.App.2d 558, 50 Cal.Rptr. 704 (1966), where the uninsured motorists provision of the policy required notice within thirty days. The court reasoned that there
is no reason to believe that investigation twenty-nine days after the accident would be more productive of discovery of the identity of the owner or the operator of the alleged offending vehicle than would such investigation thirty-one days after the event. The promptness of the claim is a matter of degree in any event, and a rule which permits the insurer to show actual prejudice should furnish it sufficient protection.
[Id. at 708.]
In Great Am. Ins. Co. v. C.G. Tate Constr. Co., 303 N.C. 387, 279 S.E.2d 769 (1981), the court provided this sound expression of the general principle:
The rule we adopt [i.e. requiring prejudice] places the notice requirement in its proper context. No condition of timely notice will be given a greater scope than required to fulfill its purpose. Simply put, the scope of the condition precedent which will relieve an insurer of its obligations under an insurance contract, is only as broad as its purpose: to protect the ability of the insurer to defend by preserving its ability fully to investigate the accident.... If, under the circumstances of a particular case, the purpose behind the requirement has been met, the insurer will not be relieved of its obligations. If, on the other hand, the purpose of protecting the insurer's ability to defend has been frustrated, the insurer has no duty under the contract. This equitable approach to the interpretation of notice requirements in insurance contracts has the advantages of providing coverage whenever in the reasonable expectations of the parties it should exist and of protecting the insurer whenever failure strictly to comply with a condition has resulted in material prejudice.
[Id. at 774-75 (emphasis added, citation omitted).]
Thus, expressly under both Hanover Ins. Co., supra, and Great Am. Ins. Co., supra, and, by implication, under the Restatement (Second) of Contracts § 229, the 120 day notice requirement must be treated in the same way as a notice requirement that speaks in more general terms. We do not perceive our endorsement of those authorities in this context as extending *597 the reach of Cooper; rather, we find them consistent with Cooper.
National contends, nevertheless, that the Cooper rule should not apply here because it is not an ordinary insurance company, but an entity created by its membership. The point made is that given National's nature, it cannot be said that the insurance policy it issued was a contract of adhesion, which was one of the reasons given by Cooper for the result it reached. That is so, but we do not believe that Cooper is limited to contracts of adhesion. In other words, the separate ground given in Cooper for the requirement of appreciable prejudice  the public policy of affording compensation to tort victims  is sufficient to justify the avoidance of forfeiture absent appreciable prejudice, particularly in light of the inequity of permitting the insurer a windfall due to a technicality, and the modern trend of requiring prejudice in reinsurance contracts, which, as we have noted, are not contracts of adhesion.
Although National attempted to show prejudice, the judge's finding that there was none is unassailable. National had no duty to defend and was fully aware of the circumstances more than six months before Gazis filed suit. Although National says that with earlier notice, it would have carefully reviewed the police and hospital records and would have engaged in its "normal methodology" and sought an early settlement before Gazis's attorney had spent too much time on the case, it does not explain why it could not have followed that course during the six months before Gazis filed suit. In short, there was obviously no prejudice at all, let alone appreciable prejudice.
Reversed and remanded for entry of judgment against National.