892 A.2d 1277

JOHN A. GAZIS, PLAINTIFF–RESPONDENT, v. FRED B. MILLER, ARCHDIOCESE OF NEWARK, (IMPROPERLY PLED AS ABC ARCHDIOCESE), AND RELIGIOUS ORDER OR ORGANIZATION (WHOSE NAMES ARE PRESENTLY UNKNOWN), DEFENDANTS AND THIRD–PARTY PLAINTIFFS, v. THE NATIONAL CATHOLIC RISK RETENTION GROUP, INC., THIRD–PARTY DEFENDANT–APPELLANT.

Argued February 15, 2006—Decided March 20, 2006.

*Gerald T. Ford,* argued the cause for appellant (*Landman Corsi Ballaine & Ford,* attorneys); *Mr. Ford* and *Andrew C. Chien,* on the brief.

*Michael T. McDonnell, III,* argued the cause for respondent (*Ryan, Brown, McDonnell, Berger & Gibbons,* attorneys).

Justice LaVECCHIA delivered the opinion of the Court.

In this appeal we must determine whether an occurrence-based excess liability policy of insurance is unavailable to an accident victim because the tortfeasor failed to give timely notice to its excess carrier. The Appellate Division held that, in the absence of prejudice, the excess insurer could not decline coverage based on the insured's failure to comply with the policy's 120 day notice provision. *Gazis v. Miller,* 378 *N.J.Super.* 59, 874 *A.*2d 591 (App.Div.2005). We agree with the conclusion reached by the panel and, therefore, affirm.

## I.

On January 9, 2000, an automobile driven by Father Fred Miller struck and injured a pedestrian, plaintiff John Gazis. Miller was

driving a car owned by his employer, the Archdiocese of Newark. At the time of the accident the Archdiocese had a primary automobile insurance policy issued by Lumberman's Mutual Casualty (Lumberman's), which provided liability protection of $250,000.[1] In addition, the Archdiocese augmented its coverage with a $750,000 excess policy (for indemnification, but not defense) issued by The National Catholic Risk Retention Group, Inc. (National).

National is a risk retention group operating pursuant to the Liability Risk Retention Act of 1986, 15 *U.S.C.A.* § 3901 to –3906, which allows it to provide liability insurance to entities engaged in similar or related activities. National's owners and insureds are Roman Catholic organizations throughout the United States. Its board of directors consists of representatives from those groups. National's policy contains the following provision:

> Notification of Claims—[the insured] shall give written notice to the Company as soon as practicable but no more than 120 days after receiving notice of any event which gives rise to or may give rise to a covered Loss irrespective of any apparent liability. . . .
>
> . . . .
>
> In the event the Insured fails to provide such notice within a 120 day period after receiving notice of any event, this Policy will not apply to any such injury.

The day after the accident, Miller reported the accident to Kemper. By April 2000, Kemper had learned that Gazis had retained counsel in respect of the accident. And, by October 2, 2000, Kemper knew enough about the extent of Gazis's injuries that it set its reserve at $275,000. It also was plainly aware by then that it should give notice to National, but did not do so until June 21, 2001, apparently without excuse. National denied cover-

---

[1] Pursuant to a separate contract, claims servicing on the Lumberman's policy was performed for the Archdiocese by Kemper National Account Service, Co. (Kemper). Lumberman's and Kemper happen both to be part of the overall family of companies related, through ownership or operation, to the Kemper Insurance Company. Because Kemper, the claims servicer, performed the processing activities on Gazis's claim, we shall refer to Kemper's activities in respect of the Lumberman's policy providing coverage to the Archdiocese on the Gazis claim.

age on the Archdiocese's indemnification claim solely because it did not receive notice of the claim within the 120 day period required by the policy.

Gazis filed his complaint against the Archdiocese in January 2002 and the Archdiocese impleaded National as a third-party defendant to obtain indemnification. The matter went to arbitration and resulted in an award to Gazis that exceeded $1 million. The Archdiocese obtained a trial *de novo* and ultimately settled with Gazis for $500,000. In settlement, Gazis accepted payment of the Lumberman's policy limit of $250,000 and an assignment of the Archdiocese's rights, if any, to recover the remaining $250,000 from National.

Thereafter, cross-motions for summary judgment were filed by the remaining parties, National and Gazis. The trial court determined that although National had suffered no prejudice as a result of the late notification, prejudice did not have to be present for National to deny coverage when an insured violated the 120–day notice requirement for claims. The court noted that the contracting parties in this risk retention arrangement were sophisticated and that the excess policy negotiated with National was not a contract of adhesion. Furthermore, the court found the policy's requirement of notice within 120 days to be unambiguous. Accordingly, the trial court denied the motion filed by Gazis and granted summary judgment to National based on the late notice. Gazis appealed.

The Appellate Division reversed and remanded for entry of judgment against National, holding that under this occurrence-based liability policy the excess carrier could not forfeit coverage unless it proved both "a breach of the notice provision and a likelihood of appreciable prejudice." *Gazis, supra,* 378 *N.J.Super.* at 60, 64, 874 *A.*2d 591. The panel relied on the rationale of *Cooper v. Gov't Employees Ins. Co.,* 51 *N.J.* 86, 237 *A.*2d 870 (1968), for imposing an "appreciable prejudice" requirement before late notice of a claim could justify a forfeiture of coverage. *Gazis, supra,* 378 *N.J.Super.* at 64, 874 *A.*2d 591. The panel

explained that whether this policy, issued as part of a risk-pooling arrangement, could be called a contract of adhesion was not determinative of application of *Cooper's* prejudice requirement. *Id.* at 67, 874 *A.*2d 591. Rather, the panel found the *Cooper* Court's concern with "affording compensation for tort victims" to be the more compelling justification for adhering to *Cooper's* prejudice requirement in this excess insurance setting. *Ibid.* The Appellate Division further found "unassailable" the trial court's finding that National failed to prove that it suffered any prejudice as a result of the delay in notice because National had no duty to defend the case and was aware of the circumstances of the case six months before suit was filed. *Id.* at 67–68, 874 *A.*2d 591.

We granted National's petition for certification seeking review of the Appellate Division's judgment. 185 *N.J.* 265, 883 *A.*2d 1062 (2005).

## II.

In *Cooper v. Gov't Employees Ins. Co., supra,* an insured was denied coverage under an automobile liability policy because neither he nor his wife notified the insurer of a car accident until two years after it occurred. 51 *N.J.* at 88–89, 237 *A.*2d 870. The insurer claimed that that was a breach of the policy because it required notification of an "accident, occurrence, or loss" to be provided "as soon as practicable." *Id.* at 89–90, 237 *A.*2d 870. The policy also stated that no action would lie against the insurer unless "as a condition precedent" the insured complied with all terms of the policy, including the notice provision. *Id.* at 91, 237 *A.*2d 870.

This Court held that an insurance carrier may not forfeit coverage unless the carrier proves both "a breach of the notice provision and a likelihood of appreciable prejudice." *Id.* at 94, 237 *A.*2d 870. In its reasoning, the Court rejected a classical contract approach that would have enforced strictly the terms of the policy as written, and instead stated that the contract should be read in

accordance with the reasonable expectations of the insured "so far as its language will permit." *Id.* at 93, 237 *A.*2d 870. In respect of the notice provision in issue, the Court observed that although identified as a condition precedent, "what is involved is a [technical] forfeiture, for the carrier seeks, on account of a breach of that provision, to deny the insured of the very thing paid for." *Id.* at 94, 237 *A.*2d 870. The Court disapproved such a result, when no prejudice to the insurer had been shown, stating that it would be unfair and "would ... disserve the public interest, for insurance is an instrument of a social policy that the victims of negligence be compensated." *Ibid.*

Although, to date, *Cooper's* principles have been applied in a variety of contexts, we specifically declined to extend *Cooper* to a claims-made policy where doing so would have constituted an unabashed rewriting of the policy coverage purchased. In *Zuckerman v. Nat'l Union Fire Ins. Co.,* an insured lawyer was denied coverage under a professional liability insurance policy because of his failure to notify the insurer of the claim until after the policy expired, notwithstanding that the insured received the complaint before expiration. 100 *N.J.* 304, 306–07, 495 *A.*2d 395 (1985). The policy was a claims-made contract providing coverage for errors and omissions occurring anytime before the effective date of the policy but limited to only claims made against the insured and reported to the carrier during the policy period. *Ibid.*

In our analysis, we distinguished between occurrence and claims-made policies, *id.* at 310, 495 *A.*2d 395, and in respect of *Cooper,* concluded that the appreciable prejudice rule, which applied to the occurrence policy in that case, was inapplicable in a claims-made policy setting because the rule would result in "an extension of the notice period" and "an unbargained-for expansion of the coverage, *gratis,* resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy." *Id.* at 324, 495 *A.*2d 395. In an occurrence policy, notice is "subsidiary to the event that invokes coverage, and the conditions related to giving notice should be

liberally and practically construed." *Ibid.* On the other hand as the Court observed, " 'in the "claims-made" policy, it is the making of the claim which is the event and peril being insured.' " *Id.* at 311, 495 *A.*2d 395 (quoting S. Kroll, "The Professional Liability Policy 'Claims Made,' " 13 *Forum* 842, 843 (1978)). In the context of primary insurance coverage, the distinction between occurrence policies and claims-made policies has continued to be observed in respect of the application of *Cooper's* appreciable prejudice rule. *See Medical Inter Ins. Exch. of N.J. v. Health Care Ins. Exch.*, 278 *N.J.Super.* 513, 520–21, 651 *A.*2d 1029 (App.Div.1995) (holding that *Cooper* appreciable prejudice rule was inapplicable to claims made policy); *Molyneaux v. Molyneaux*, 230 *N.J.Super.* 169, 177, 553 *A.*2d 49 (App.Div.1989) (finding *Cooper* prejudice rule applicable in occurrence policy context).

As mentioned, New Jersey courts have applied the *Cooper* prejudice rule in various other contexts. *See, e.g., Pfizer v. Employers Ins. of Wausau*, 154 *N.J.* 187, 206, 712 *A.*2d 634 (1998) (stating as general proposition that New Jersey requires a showing of prejudice before insurance can be denied due to late notification); *Sagendorf v. Selective Ins. Co. of America*, 293 *N.J.Super.* 81, 94–95, 679 *A.*2d 709 (App.Div.1996) (holding that under both "garage" policy and umbrella insurance policy, insurer must show prejudice from service station insured's failure to provide notice "as soon as practicable" for coverage for environmental spill); *Solvents Recovery Serv. of New England v. Midland Ins. Co.*, 218 *N.J.Super.* 49, 51–55, 526 *A.*2d 1112 (App.Div. 1987) (holding that general liability insurer required to show prejudice before late notification of occurrence, claim or suit will bar coverage for environmental cleanup); *Costagliola v. Lawyers Title Ins. Corp.*, 234 *N.J.Super.* 400, 406, 560 *A.*2d 1285 (Ch.Div. 1988) (finding that title insurance provider must show prejudice before coverage will be avoided for breach of five-day notice requirement).

Prior to the present appeal, the Appellate Division considered application of the *Cooper* prejudice rule in an excess insurance

setting, albeit in a case where the contract did not contain a "no later than 120 days" notice provision. In *Peskin v. Liberty Mutual Ins. Co.*, three insureds, covered by personal catastrophe policies, notified their excess insurance carrier of a fire eleven years after the occurrence and twenty-one months after suit was filed against them. 219 *N.J.Super.* 479, 480–82, 530 *A.2d* 822 (App.Div.1987). The Appellate Division concluded that the excess insurance provider was required to show prejudice under *Cooper* before the insureds' failure to provide notice of an occurrence "as soon as practical" would void coverage. *Id.* at 481, 530 *A.2d* 822. This appeal presents our Court with its first opportunity to address *Cooper's* applicability to an excess insurer.

## III.

As already noted, in this matter we conclude that the Appellate Division was correct in applying the Court's rationale in *Cooper v. Gov't Employees Ins. Co.*, 51 *N.J.* 86, 237 *A.2d* 870 (1968), to an excess automobile liability insurer. We agree essentially with the reasoning set forth in the succinct and persuasive opinion authored by Judge Coburn and, therefore, will underscore only why this appeal presents circumstances close enough to those in *Cooper* to justify its extension.

At bottom, we are concerned here with liability insurance coverage for an automobile accident victim, notwithstanding that this coverage is excess to the insured's primary policy. We approach the coverage question in these circumstances mindful of the strong and overarching public policy that led to the omnibus liability coverage statute governing every owner of a motor vehicle registered in New Jersey. *See N.J.S.A.* 39:6B–1(a); *see also The Proformance Ins. Co. v. Jones*, 185 *N.J.* 406, 414–15, 887 *A.2d* 146 (2005) (stating that comprehensive insurance scheme of mandatory automobile insurance evinces "strong legislative policy" of assuring financial protection to innocent accident victims). Our system of mandatory liability insurance reflects the public interest in assuring that tort victims receive compensation for injuries caused

by automobile operation. That strong public policy—in favor of spreading the risk of protecting innocent victims of automobile accidents—permeates our approach to primary policies of automobile liability insurance, *see Cooper*, and logically extends to excess policies acquired to enhance the amount of liability coverage available to protect such victims.

Moreover, although this is an excess liability setting, application of *Cooper's* prejudice requirement does not have the perverse effect of using *Cooper's* rationale to write a better policy for an insured than that which was purchased, *see Zuckerman, supra*, 100 *N.J.* at 322–24, 495 *A.*2d 395 (1985) (rejecting application of "appreciable prejudice" doctrine to expand liability under claims-made policy), but rather, effects vindication of the public policy of this State in favor of protecting automobile accident victims, notwithstanding technically late notice. In explaining its reasoning, the Appellate Division correctly discounted whether this risk retention group, as a whole, or the Archdiocese, in specific, could be described as sophisticated, or whether the contract was a contract of adhesion. The *Cooper* Court did not treat those concerns as essential conditions and focused instead on the forfeiture issue. The Appellate Division in this matter recognized that the important consideration was whether compensation under the liability policy, albeit for excess coverage, would be available to cover a claim based on injuries to an automobile accident victim. That it was excess did not, and should not alter the relevant analysis.

National had to have demonstrated that its 120 day notice provision was material to the coverage purchased by the members of the risk retention group. As we see it, each member of the group was entitled to expect coverage from the group for injuries to accident victims, provided that late notice of a claim did not cause prejudice to National. National would have us accept the converse—that the group was entitled to expect strict contract adherence in respect of notice from each member as a condition of coverage, whether or not any appreciable prejudice could be

demonstrated by National. In this setting, the principles of *Cooper* resonate and compel rejection of National's position. National has not demonstrated the materiality of the notice provision to the coverage purchased through the risk retention group. Having failed that hurdle, National therefore must show that, in respect of each particular claim, it has been prejudiced by the late notice.[2]

We do not mean to suggest that every notice provision in an insurance setting can be discarded in favor of an "appreciable prejudice" requirement. However, as to this occurrence-based excess policy of liability insurance, when recompense for an accident victim's injuries is in the balance, the correctness of the Appellate Division judgment is manifest.

## IV.

The judgment of the Appellate Division is affirmed.

Justice RIVERA–SOTO, dissenting.

In this appeal, we have been asked to extend the "appreciable prejudice" rule of *Cooper v. Gov't Employees Ins. Co.*, 51 *N.J.* 86, 237 *A.*2d 870 (1968), to the notice-of-claim provision of an occurrence-based excess liability policy of insurance that requires, as a condition precedent to coverage, that the insured provide the insurer notice no later than 120 days after the event that causes the insured to seek coverage. On the application of The National Catholic Risk Retention Group, Inc. (National), a risk retention group consisting of defendant Archdiocese of Newark and over sixty dioceses and other Roman Catholic organizations nationwide operating pursuant to the Liability Risk Retention Act of 1986, 15 *U.S.C.* §§ 3901–3906, the trial court entered summary judgment in

---

[2] If National had demonstrated that the insured's non-compliance with the 120 day notice provision caused National to lose reinsurance coverage for the late claim, then the appreciable prejudice standard may have been satisfied. That demonstration was not made here.

National's favor. The Appellate Division reversed, *Gazis v. Miller*, 378 *N.J.Super.* 59, 874 *A.*2d 591 (App.Div.2005), a conclusion the majority endorses in its holding that, "in the absence of prejudice, the excess insurer could not decline coverage based on the insured's failure to comply with the 120 day notice provision." *Ante,* 186 *N.J.* at 225, 892 *A.*2d at 1278 (2005). Because I disagree with such an unwarranted extension of the *Cooper* rule, particularly in the circumstances presented here, I respectfully dissent.

In my view, the trial court's analysis is the correct one:

> [T]he *Cooper* prejudice rule and its progeny are not dispositive of the issues presented. The *Cooper* prejudice rule has not been extended to include reinsurance policies containing specific notice requirements ...
>
> The Court in *Pfizer* stated [that] the policy behind requiring a showing of prejudice in late notice claims "is to protect the interests of policyholders because insurance contracts are contracts of adhesion and policyholders should not lose the benefits of coverage unless the delay has prejudiced the insurance company." *Pfizer[, Inc.] v. Employers Ins. Of Wausau,* 154 *N.J.* 187, 206, 712 *A.*2d 634 (1998). However, reinsurance contracts are not contracts of adhesion. Rather, they are contracts entered into between sophisticated parties bargaining at arms length.[1]

As the trial court held, "[t]he notice provision at the heart of this matter provides for a specific time period in which notice must be provided. Furthermore, the provision clearly enunciates those types of high-risk claims that must be reported and the consequences for failure to provide timely notice." The trial court found that the terms of National's excess liability insurance policy in respect of the requirement of written notice "as soon as

---

[1] The contract at issue between the Archdiocese, as an insured, and National, as the insurer, is a contract of excess liability insurance provided by a risk retention group of which the Archdiocese was a member. Thus, this is not a true reinsurance contract. However, to the extent this excess liability insurance policy was the result of a group of like-minded insureds banding together to create a liability pool from which covered claims were to be paid, there are parallels to a reinsurance contract. For that reason, the trial court's reference to the excess liability insurance contract here as a reinsurance contract, albeit technically incorrect, is understandable, ultimately is irrelevant to the analysis, and, in any event, was corrected by a supplementary letter issued by the trial court pursuant to *R.* 2:5–1(g) ("We all understand that the contract of insurance was one of 'excess' and not 'reinsurance.' ").

practicable but no more than 120 days after receiving notice of any event which gives rise to or may give rise to a covered Loss irrespective of any apparent liability" were unambiguous. As a result, the trial court held that the insured under that policy of excess insurance, the Archdiocese of Newark, "breached the insurance contract by failing to provide notice within the 120–day timeframe. In fact, notice was not given until June 21, 2001, nearly one and one-half years after the subject accident." In the end, the trial court concluded—in my view, correctly—that "the *Cooper* prejudice rule does not apply to a reinsurance contract between sophisticated parties that contains an unambiguously specified time limit of 120 days. To hold otherwise would make the reinsurance contract, which shareholders bargained for, worthless."

Invoking "the public interest in assuring that tort victims receive compensation for injuries caused by automobile operation," *ante,* 186 *N.J.* at 232, 892 *A.*2d at 1282 (2006), both the Appellate Division and the majority run roughshod over the uncontested facts and the clear and unambiguous policy language. However, that public interest cannot serve as the all-purpose excuse for a clear breach of contract. It is undisputed that the accident for which coverage is sought occurred on January 9, 2000; that a team of physicians from Kemper National Account Service Co. (Kemper), the Archdiocese's automobile claims administrator that contractually was responsible for all appropriate notices to National, examined plaintiff and issued a report dated March 1, 2000, still well within the 120–day notice period; that, on October 2, 2000, under the heading "Future Course of Action," Kemper's own status report admitted that "[it] also need[ed] to alert [National] of this loss;" that Kemper's written admission that "[it] also need[ed] to alert [National] of this loss" was a refrain that appeared in Kemper's subsequent status reports; and that, despite those facts, Kemper did not notify National of this claim until June 21, 2001, eighteen months after the accident occurred, more than fifteen months after Kemper's physicians filed their report concerning this accident, and more than eight months after Kemper admitted

in writing that it was obliged to notify National concerning this claim.[2]

The failure to act here was not National's but Kemper's, the Archdiocese's delegatee, an abject failure that remains unexplained in this record. Moreover, no satisfactory explanation has been tendered as to why the Archdiocese itself did not seek relief against Kemper for its breach of contract. When asked at oral argument, counsel for plaintiffs, who represented the interests of the insured,[3] was unable to explain why the Archdiocese did not proceed directly against Kemper, and the record provides no indication that Kemper otherwise is unable to answer for its misdeeds.

Given these facts, this case presents a singularly poor candidate for the sweeping rule the majority announces, particularly in light of the majority's exclusive reliance on the public policy favoring recovery for tort victims. Plaintiff here had a full and complete remedy: a lawsuit for damages against the tortfeasor who injured plaintiff, Father Fred B. Miller, and the owner/insured of the car, the Archdiocese. That is precisely what plaintiff did. The availability of insurance to cover the Archdiocese's liability was the Archdiocese's concern, and not plaintiff's. To the extent plaintiff voluntarily assumed that concern by reason of the settlement he entered into with the Archdiocese, then plaintiff's interests can rise no higher than those of the Archdiocese. Thus, the application here of our public policy that affords compensation to tort victims is misguided.

There is an additional, overarching reason that counsels strongly against the result the majority reaches. As the trial court noted, the excess liability insurance contract at issue was entered

---

[2] The majority does not hinge its analysis on these failures. They are relevant, however, to the conclusions I advance.

[3] Plaintiff settled his claim against the insured, the Archdiocese of Newark, and, as part of that settlement, was assigned the Archdiocese's rights, if any, against National under the excess liability policy.

into between two sophisticated parties and was unambiguous in its terms. Under those circumstances, a primary obligation of the common law is to provide certainty in outcome. *See, e.g., Davidson Bros., Inc. v. D. Katz & Sons, Inc.,* 121 *N.J.* 196, 225, 579 *A.*2d 288 (1990) (Pollock, J., concurring) ("As troublesome as uncertainty is in other areas of the law, it is particularly vexatious in the law of real property.... [T]he majority's reasonableness test generates confusion that threatens the ability of commercial parties and their lawyers to determine the validity of such covenants."). In a different context, we noted that

> [t]he idea of black letter law seduces us. We crave coherence and certainty in the law as we do in many areas of our lives. We know better, of course. We know that legal doctrine is often indeterminate—that in a particular case, perfectly convincing arguments supporting one conclusion can often be countered by perfectly convincing arguments supporting the opposite conclusion. Yet we continue to search for rules, principles, tests, approaches—anything that will impose order on doctrine.
>
> [*Lebel v. Everglades Marina, Inc.,* 115 *N.J.* 317, 318, 558 *A.*2d 1252 (1989) (quoting Richard K. Greenstein, *The Nature of Legal Argument: The Personal Jurisdiction Paradigm,* 38 *Hastings L.J.* 855, 855 (1987)).]

We should be so seduced here. Sophisticated commercial parties are entitled to rely on the commonsense notion that they will be bound by the plain meaning of the words to which they agree. When sophisticated parties covenant that an act is to be performed "no more than 120 days after receiving notice of any event which ... may give rise to a covered Loss," they mean precisely that: one hundred twenty days. For a rationale inapplicable in this setting—that our public policy favoring compensation for victims of automobile accidents trumps clear, bargained-for contractual limitations of coverage—the majority denies National the benefit of its bargain and rewrites the contract between these parties to now read that notice must be given "no more than 120 days after receiving notice of any event which ... may give rise to a covered Loss, *provided, however, that the 120 day deadline for performance will be extended to the benefit of the defaulting party and to the detriment of the non-defaulting party for so long as the non-defaulting party is not appreciably prejudiced thereby.*" (added text underscored.) In so doing, the majority oversteps its

authority, weakens the import of admittedly unambiguous and clear contractual language, and protects a wrongdoer at the expense of the innocent.

For the foregoing reasons, I respectfully dissent.

*For affirmance*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Dissenting*—Justice RIVERA–SOTO—1.